Argued March 5, application denied September 5, petition
for rehearing denied September 17, 1968

In re Application for Reinstatement of
## HERBERT D. BLACK
444 P. 2d 929

*William E. Hurley*, Portland, argued the cause for applicant. With him on the briefs were Bernard, Bernard & Hurley, Portland.

*Ronald A. Watson* and *Philip Hammond*, Portland,

argued the cause and filed a brief for the Oregon State Bar.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

PER CURIAM.

This matter is before the court on a petition to review an adverse recommendation of the Board of Governors of the Oregon State Bar on an application for reinstatement by a disbarred attorney. The applicant was disbarred by order of this court in 1961 for employing runners to solicit personal injury cases. See 228 Or 9. The trial committee appointed by the Board of Governors to hear the application unanimously recommended to the Board that applicant be reinstated. Two members of the trial committee so recommended because they believed applicant had been wrongfully convicted of the original charge, and the third member believed applicant should be reinstated because he had subsequently demonstrated good moral character. The two attorneys appointed by the bar to resist the application stated to the trial committee, after the hearing, that it was their personal conclusion that the applicant should be reinstated. Despite this unanimity of opinion, the Board of Governors recommended to this court the denial of the application.

■ The applicant testified at his original disbarment proceeding that he had not employed persons to solicit cases, and in the present proceeding he continues to so maintain. It follows either that applicant was erroneously found guilty or he is presently lying and, therefore, not entitled to reinstatement. Applicant has the burden of proving that he was erroneously con-

victed. In order to determine whether applicant has met his burden, the principal incriminating evidence upon which he was originally found guilty must be compared with the evidence introduced at the hearing on his application for reinstatement.

In the original disbarment proceeding there was substantial evidence tending to prove that applicant was guilty of the charges against him. Many apparently credible witnesses testified that, either at the scene of their automobile accident or shortly afterwards, persons appeared who recommended the applicant as a good lawyer for their case and furnished them with applicant's name and either with his address or telephone number or both. One or more of three persons were usually identified as the person or persons who appeared at the accident for the purpose of solicitation. They were George Barnard, Ray Knipple, and Jack Ryder. Many of the persons so solicited did contact applicant and he did represent them.

Notes in the handwriting of Knipple relating to accidents and the individuals involved were found torn into small bits among the contents of a wastebasket in applicant's office and were introduced in evidence. An example was one which read:

> "Emil Schweitz 5085 Linn Lane West Linn, Ore. Phone—OL-6-2255. Hit in crosswalk. 13th and Sandy Blvd. Hit him Elvin Conley, Rt. 1, Box 662 Oregon City OL-6-6865."

Also on the note were the words: "Herbert—pd."

Another was as follows:

> "Carl Brummett, 734 N. Columbia Blvd. 56 Chev. Paid. Cement truck rolled on him. Herbert —"

Applicant did represent both Mr. Schweitz and Mr. Brummett.

A young female witness testified she was present in the waiting room at applicant's office when he gave a large number of his business cards to Barnard for the purpose of distribution to persons involved in accidents.

Applicant was shown to have loaned $1,000 on an unsecured note to a friend who was the source of some referrals to him.

Applicant also was shown to have loaned $2,260 to Barnard on an unsecured note, which was never paid. Applicant testified the money was loaned to Barnard for use in Barnard's fish business.

Neither Barnard, Knipple or Ryder testified during the original proceeding. A preliminary investigatory deposition was taken of Barnard which was introduced in evidence but which disclosed no information of importance. Subpoenas were issued for Barnard and Knipple, but they could not be found within the state. Ryder was also without the jurisdiction of the state. Likelihood at that time of securing testimony from Barnard and Knipple was negligible, as both were under indictment for using the mails to defraud in attempting to secure money from insurance companies by staging fake automobile accidents. They were subsequently convicted of the charge in federal court.

In the original proceeding applicant was unable to offer any explanation of the testimony of the many persons who said they had been solicited on his behalf. At the hearing on the application for his reinstatement applicant admitted for the first time that some of the cases which he handled had actually been solicited for him. He contended, however, that the solicitation had occurred without his knowledge, that he had not paid therefor, and that he had not been aware of the solici-

tation at the time of his original disbarment. He proposed the following explanation. Another lawyer had been soliciting cases without applicant's knowledge. An investigation was being conducted of this lawyer's conduct and he wanted no more cases sent to him during the investigation so he directed his runners to send their cases to applicant to divert attention from himself, all without applicant's knowledge or consent.

To help substantiate his explanation applicant offered as a witness an attorney who had represented both Barnard and Knipple in their unsuccessful appeal from the federal conviction. The witness testified that he had had a conversation with Knipple at the request of applicant's attorney in which Knipple was asked if he thought his notes could have been found in the wastebasket of applicant's office. Knipple answered, no, that he had kept very careful track of his notes, but that they could have been taken from his house. The witness also testified, in the presence of Barnard, that Knipple had told him that he and Barnard had been running cases for the other lawyer and that the latter had told them that he was under investigation and suggested that they send some cases to applicant. The witness said Knipple further stated to him that he had no reason to believe applicant knew what was going on. The attorney also testified that Barnard, in the same conversation, had made some remarks that led him to believe they would attempt to obtain money from applicant in return for favorable testimony.

Applicant testified Knipple subsequently called him and offered favorable testimony for money and that applicant turned the offer down. He stated that Knipple then told him, in effect, if you don't take care of us, we won't take care of you.

Thereafter Knipple's testimony was taken by deposition in this proceeding and the deposition was received in evidence. In the deposition Knipple admitted that he had attempted to secure money from applicant, that he had previously said he had not given his notes to applicant and that he had said he had no reason to believe that applicant had knowledge that the cases sent to him had been solicited. However, he testified that applicant had known of the solicitation, that he had discussed it with him and that applicant had actually paid him a small amount of money directly, but that most of the time he got his money from applicant through Barnard. He testified he had torn up the notes in applicant's office, put them in an ash tray and told applicant he had better burn them.

Barnard's testimony was similarly taken. He first testified that he had discussed the pay off with applicant, and that he had told applicant that he would get his percentage from the other lawyer, for whom he testified he had been working and from whom he stated he had received instructions to refer cases to applicant. Barnard said he understood the arrangement to be that applicant would pay the other lawyer a referral fee and that this lawyer would split that fee with Barnard. Subsequently he changed his testimony. He said he did not know whether he had discussed the matter of his payment with applicant, and that he couldn't say whether applicant had known he was getting money for the cases he sent to applicant, but that applicant had to be stupid to think that he was not being paid for the referrals. He denied he had paid any money to Knipple on applicant's behalf.

The conflict in the testimony and out-of-court statements of Barnard and Knipple, relating to applicant's knowledge that cases were being solicited for him,

makes their testimony unconvincing in this respect. It is suggested by applicant's counsel that Barnard and Knipple could have no purpose in lying to their attorney in the federal case concerning applicant's lack of involvement. Barnard and Knipple must have known the inquiry was being made upon applicant's behalf and it is entirely possible they saw a way they might get some money if their responses were favorable. This is indicated by applicant's testimony that they attempted to extort money from him in return for favorable testimony.

A short resume of applicant's experience in the practice of law, his familiarity with the personal injury business and his relationship with the lawyer he accuses of having solicited the cases referred to him, will help in evaluating the applicant's proposed explanation of what occurred and the probability that he did not know of the solicitation on his behalf. Applicant was admitted to practice in 1955 at the age of 29. During most of his attendance at law school he had been employed in Portland as a claims adjuster, claims examiner, and claims supervisor for an insurance company which sold automobile liability insurance. After his admission to practice he was house counsel for the company for about a year. In February of 1957 he formed an office association in Portland with the lawyer whom he claims directed that the solicited cases be sent to him. His arrangement was that he would receive all office overhead in return for such services as his associate demanded, but he was principally dependent upon his own efforts for income. This association continued until August 1, 1959, when he moved to another building and established his own office with another lawyer.

When applicant commenced practice he had many

acquaintances among insurance agents who formerly had been employed by the insurance company for which he had worked and who were the source of considerable personal injury business to him. He had lived his entire life in Portland where he had a wide circle of friends. The matters with which he was charged occurred in 1959 and 1960. Even though applicant had a wide acquaintance with insurance agents and had many friends, his personal injury practice was disproportionately large considering the short length of time he had been practicing law.

The proposed explanation of how solicited business reached applicant without his knowledge that it was solicited is improbable. While the motivations for human actions are many and varied, it is illogical that his original office associate, under the pressure of investigation, would instruct his runners to direct cases to applicant. There was always the danger of the runners' further activities being reported to the authorities, regardless of whom they were working for, resulting in a continued investigation revealing the identity of their original employer. It seems more probable that the runners would be instructed to terminate their activities until the investigation was over. If applicant's original office associate believed that the runners would not terminate their activities, but would find other similar employment, it seems unlikely he would tell them to work for someone who had been so intimately associated with him. The first evidence of the runners' activities on applicant's behalf was a case they solicited for him on May 26, 1959. Applicant did not establish his own office until August 1, 1959. If diversion of attention from himself was the motivating force for the associate's action, it is unlikely that he would attempt to accomplish it by sending cases to

applicant who was his office associate and in his employ.

It is similarly unlikely that the runners were working for nothing. Applicant says he knew nothing of the solicitation and made no payment therefor. This left only his original office associate to pay for the running, and this seems unlikely if he were receiving no monetary benefit.

Applicant attempted to impeach the testimony of the female witness who had testified applicant had given cards to Barnard for distribution at accidents. She was shown to have subsequently testified in Barnard's and Knipple's federal trial that she saw nothing handed to Barnard during the visit to applicant's office in question. However, at the time she so testified in the federal trial, she was being questioned concerning Barnard's contact with applicant's office associate rather than applicant. The nature of her association with Barnard might be indicative of some emotional instability. However, the value of the attempted impeachment is doubtful. Nevertheless, we would not want to determine applicant as being untruthful upon her testimony alone.

Subsequent to the original proceeding the friend to whom applicant had loaned the $1,000 gave a mortgage to applicant to secure his note and it was paid when the friend sold his home. We conclude this was a bona fide loan.

■ Applicant now admits that he was guilty of misconduct in loaning Barnard money when he knew that Barnard was the source of business to him. Applicant concedes that he had knowledge that Barnard had referred the personal injury cases of his mother-in-law and father-in-law to him, as well as those of two other persons. He states that the loan was bona fide and that

he expected to be repaid, but that in all probability he would not have loaned Barnard the money had Barnard not been a source of business. He stoutly maintains, however, that he knew of no payment to anyone who referred business to him, or that he knew of any organized solicitation. While applicant admits improper actions in loaning the money to Barnard, if it was a loan, such by itself would not ordinarily be grounds for permanent disbarment.

Prior to the hearing on the application for reinstatement, applicant submitted to a polygraph or lie detection test in which he was asked questions relevant to his conduct and knowledge concerning the circumstances upon which his disbarment was based. The operator of the polygraph testified over objection that applicant answered these questions in a manner inconsistent with any knowledge on his part that he was the beneficiary of paid solicitors. In the operator's opinion the applicant had answered the questions truthfully. The attorneys representing the bar were not completely satisfied with the questions asked or the operator conducting the test. They stipulated, however, that the results of a second test would be admitted in evidence if respective counsel could agree on both the operator and the questions. This was done, and the hearing was recessed for the purpose of permitting applicant to be tested again. The results were again favorable to applicant and totally inconsistent with any knowledge on his part tending to substantiate the original charges made against him in the disbarment proceeding.

This brings the focus of our inquiry to the weight to be given to the polygraph results. The Committee on Government Operation submitted its tenth report to the 89th Congress on March 22, 1965 (House Report No. 198), entitled "Use of Polygraphs as 'Lie Detectors'

by the Federal Government," which was based upon a study made by its Foreign Operations and Government Information Subcommittee. The following language is from a summary in the report at page 13:

"* * * The machine records physical responses which may or may not be connected with an emotional reaction—and that reaction may or may not be related to guilt or innocence. Many, many physical and psychological factors make it possible for an individual to 'beat' the polygraph without detection by the machine or its operator."

The further language appears from a summary on page 25:

"Federal investigators have given thousands upon thousands of polygraph tests, yet there has been no attempt to determine the validity of the procedure and no attempt to find out whether the polygraph operator really can detect falsehoods. No statistical proof has been compiled despite thousands of cases; no scientific proof has been produced despite thousands of opportunities."

The following is an excerpt from an article appearing at page 127 in the November-December 1962 issue of the Harvard Business Review entitled "Don't Trust the Lie Detector" by Sternbach, Gustafson and Collier:

"* * * *there exists no public body of knowledge to support the enthusiastic claims of operators.* There are no publications in reputable journals, no facts, no figures, tables, or graphs. In short, there is nothing to document the claims to accuracy or effectiveness except bald assertions.

"The curious fact about this polygraph business of lie detection is that very few adequately controlled studies of its effectiveness have ever been made. And the useful studies have been done not by the people in the business itself, but by 'academic workers,' mainly physiological psychologists. The results of *their* studies indicate that the degree of

success is close to 70%, much lower than the figure reported by the commercial operators. The controlled laboratory studies are criticized vehemently by the commercial operators as being contrived and artificial, not 'real life' situations. This is true. But until figures from less artificial yet controlled studies are presented, these figures must be accepted." (Emphasis theirs.)

An article entitled "The Polygraph" by Burke M. Smith appearing at page 25 of the January, 1967 issue of Scientific American contains the following statement:

"The lack of research gives rise to the major question about investigative polygraphy: How well does it work? To be effective an instrument or a test must be valid and it must be reliable. Validity is the extent to which something measures what it is supposed to measure: the Rorschach test, for example, can be considered a valid test of personality only insofar as its results show positive correlations with the results of other personality tests and with experience. Since the polygraph as an instrument measures not lies but physiological changes, the question is how well the results of the total polygraph examination—the interrogation, the record and the interpretation of the record—correlate with objective, independent measures of deception.

"Good evidence on this question can come only from a comparison of examination findings with the results of thorough, independent investigations. There are no such statistics. * * *"
* * * * *

"In spite of all these problems, a polygraph interrogation by an experienced examiner certainly has a better-than-chance probability of arriving at a correct determination of truth or deception. The question is: How much better? Polygraphers claim anywhere from 95 to 100 percent accuracy but, as I have indicated, they have no valid statistics to sup-

port their claims and few scientists have sought to investigate the matter. Joseph F. Kubis of Fordham University did conduct a study of the methods of polygraphy in 1962. His major experiment involved a sham theft situation: the examiners had to distinguish a volunteer 'thief' from a 'lookout' and an 'innocent bystander' on the basis of polygraph interrogations. Kubis found that the examiners correctly identified the volunteers' roles in 73 to 92 percent of the cases; in 112 sessions only two 'innocent bystanders' were incorrectly called 'thieves.' The galvanic skin response provided the highest accuracy (about 90 percent); the respiratory and cardiac indicators yielded figures of 60 to 70 percent. In another experiment, in which parolees were told to lie twice about their criminal records, examiners were able to detect both lies in 40 percent of the cases, one lie in 48 percent and neither lie in 12 percent. In a counter-measure experiment the subjects were able to reduce the examiners' accuracy scores from 75 percent in a control test to 25 percent by thinking of something exciting or upsetting and to 10 percent by tensing their toe muscles."

To the contrary, the following language is found at page 234 in a book entitled "Truth and Deception," by Reid and Inbau published in 1966:

"Our actual case experiences over the years have involved the Polygraph examination (either personally or under our direct supervision) of over 35,000 persons suspected or accused of criminal offenses or involved in personnel investigations initiated by their employers. On the basis of that experience we are confident that the technique, *when properly applied by a trained, competent examiner,* is very accurate in its indications. The percentage of *known* errors with the technique used in the laboratories of John E. Reid and Associates is less than 1 percent. Of the remainder no diagnosis at all is attempted in about 5 percent of the cases, because of such factors as the physiological or psy-

chological impairment of the subjects." (Emphasis theirs.)

Similar statistics appearing in another book by the same authors are criticized in the following language from the hereinbefore quoted article in the Harvard Business Review:

"Some commercial operators, in approaching prospective buyers of their services, claim up to 95% accuracy and less than 1% error, with remaining cases being called 'inconclusive.' In their book, *Lie Detection and Criminal Interrogation*, Fred E. Inbau and John E. Reid offer some figures purporting to justify such claims, but the figures are extremely misleading. For example, they state that out of 4,280 cases run over a five-year period, 64.5% were *reported* innocent of the crime, 31.1% were *reported* guilty, and 4.4% were indefinite (page 129). The reports were based solely on the polygraph records. Of the group of persons reported guilty, only 791 (59.3%) were 'interrogated with the aim of obtaining a confession,' and of these only 61.4% did confess. In other words, only 36% of the individuals who were reported as guilty on the basis of their polygraph records were actually verified as such. And only 11.7% of the cases reported as innocent were later verified as such. Together there were 18.9% of cases verified as correct. The percentage of *verified* errors was 0.07% (the figure of 0.0007% cited in the book is incorrect)." (Emphasis theirs.)

■ Examination of the above authorities reveals that no definite conclusions can be drawn concerning the extent to which a polygraph works. Apparently there has been insufficient research to establish the extent of its accuracy, though it appears that it may be a valuable accessory to a determination of the truth a good proportion of the time. In the present case it is a matter of weighing its value, together with the other

evidence favorable to applicant's contention, against the contrary evidence, keeping in mind that the burden is upon the applicant. By considering the evidentiary value of the polygraph test in the present proceeding we do not intend to imply that polygraph evidence is admissible in civil or criminal actions unless both parties consent to the receipt of such evidence. Reluctantly, we come to the conclusion that applicant has not carried his burden.

The court is extremely sensitive to the possibility of a miscarriage of justice and is aware that absolute certainty can never be achieved. It is unthinkable to ruin the professional life of an attorney erroneously. On the other hand, it is the court's duty to protect the public from forms of practice that are inimical to the public interest.

As previously pointed out, an attempt by applicant's original office associate to divert attention from himself by having the cases sent to applicant is highly unlikely because of the close business relationship that existed between him and applicant.

No rational explanation has been furnished, other than guilt, for the presence of the admittedly genuine notes of Knipple in the wastebasket of applicant's office. The notes were found a considerable length of time after applicant left the office of his original associate whom he accuses. There is no suggestion by applicant that the notes represented dealings between Knipple and his office associate at the time the notes were found. Nor is such an explanation plausible, since applicant's name appeared on some of the notes. An inference is attempted to be drawn that the notes were placed in a wastebasket in applicant's office by someone who stole them from Knipple's home. No such inference can be drawn because Knipple's statements

concerning their possible theft were equivocal. There is no evidence that the police officers or the cleaning lady, who gave the police the contents of applicant's wastebasket, were guilty of planting evidence. Indeed, such evidence could only have been secured by them for such purpose by theft or Knipple's connivance. At that time it was contrary to Knipple's interests to have the notes fall into the hands of the authorities. No one is suggesting that the cleaning lady or the police burglarized Knipple's home.

The presence of the notes in applicant's office is only compatible with two possible explanations: guilt or a frame-up. There is no credible evidence of the latter, and, therefore, we reluctantly must accept the former.

The application for reinstatement is denied.