Argued June 25, affirmed August 12, reconsideration denied
September 18, petition for review allowed October 22, 1974.

STATE OF OREGON, *Respondent, v.* ROGER
LYNN GREEN (No. 8036), *Appellant.*

525 P2d 205

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for appellant.

*Robert E. Brasch,* District Attorney, Coquille, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Defendant appeals from conviction of two counts of murder. ORS 163.115. Error is claimed in that the trial court (1) overruled his objections to "polygraph evidence" and (2) erred in giving instructions defining "extreme emotional disturbance" under ORS 163.125.

The bizarre slaying of two young ladies occurred in Coos County on July 28, 1973. By August 8 police had received some evidence pointing to defendant as a suspect and they contacted him on that day. The defendant gave them an account of what he had been doing on the day the murders occurred. In their discussion with the defendant the officers suggested he take a polygraph examination which he agreed to do. The officers left him at his home and

defendant voluntarily came to the police office later the same day. At that time he told the policemen he had lied to them in his previous conversation about not possessing a .22 caliber rifle, which was the type of weapon used in the murders, and he offered to have his rifle examined because he thought it recently had been tampered with by someone else. After the rifle was secured, one of the officers who was schooled therein proceeded with the polygraph test, after which the defendant was allowed to leave. The defendant was adequately warned of his *Miranda*[①] rights at all times. The next day another officer who was a polygraph expert came to Coos County for the purpose of giving another polygraph test which the defendant agreed to take. This officer testified that when he was done with the test and still alone with defendant:

> "* * * I told him that I felt that he was involved in the homicide and that he should tell me the truth, that there was no way in the world that I was going to believe that he was not involved, and that he should seek some type of help, whatever help it might be, but he needed help at this time, and if he felt he wanted to talk to me, I was a good listener. And at that time he began to cry and put his hands to his face and he said he needed help a long time ago.
>
> "And at that time I asked him, 'Well then, you are involved? You killed those girls?' And he said, 'Yes. I didn't think I was capable of such a thing, but I did.' "

The officer also testified that the primary purpose of his giving the polygraph examination was to obtain a confession from the defendant. The last polygraph examination had lasted about 37 minutes. The giving of

---

[①] Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

both was voice-recorded on tape, besides being recorded on the machine's usual tracing tape of the examinee's physiologic reactions as he answered questions. After the initial confession defendant put a more complete confession upon voice tape by means of a recorder in the presence of five officers.

■ ■ The defendant contends that the results of the polygraph examinations were erroneously allowed into evidence heard by the jury. The court conducted an *in camera* hearing (the report of it takes up the major part of 800 pages of transcript) before the trial commenced to determine whether the confession had been voluntarily made, and concluded that it had and that the confession and evidence with reference to the voluntariness thereof would be submitted to the jury. In ruling upon the defendant's objection to receipt of the polygraph evidence, the court stated:

"* * * The State is entitled to prove if it can that confessions were voluntary. It is entitled to show and must show the totality of the circumstances. The fact that a person was subjected to a polgraph [sic] test is an important circumstance. It might very well be found by the jury to be such a thing as to override his will power. I am going to permit it, and you may have a continuing objection.

"* * * * *

"I'm going to permit the testimony to come in as to the fact that a polygraph test was given. I am going to permit the accusations of the officers that he was being untruthful based upon the polygraph test to come in, but I'm not going to permit the polygraph test or any bolstering of the officers' testimony based upon the polygraph *results* to be brought in. This ruling applies only to the prosecution. The defense, if it wishes, may introduce the actual polygraph tests * * *." (Emphasis supplied.)

The court was careful throughout the trial to point out and require that the results shown by the polygraph machine tracings should not be brought into the court or referred to as evidence. This was in compliance with the general rule rejecting polygraph test results as evidence except under stipulation. *See* Annotation, 53 ALR3d 1005 (1973). But the prosecution did place before the jury tapes of the conversation the polygraph expert had with the defendant while they were jointly observing the results of the test. In this colloquy they discussed which questions had caused the greatest and least jumps of the tracing pen on the machine; "where your blood pressure really shot up." At the end of this colloquy the expert said to defendant, "* * * The only thing that I can say is that you're not telling me the truth."

Obviously, where the expert tells the jury that he informed the defendant that he was not believed, from that, and the observations about the questions that caused the greatest reaction, the jury will infer that the results of the polygraph test show defendant to have been untruthful, regardless of whether the jury sees the tracing from it. In reality then, there is a very thin line between what the court ruled could not be told in this regard and what the jury actually did hear.

Nevertheless, under case law it appears to be generally established that evidence like that received at bar is admissible as part of the "totality of the circumstances" surrounding a confession so that the jury may have all of the evidence in order to make its determination as to whether the confession is voluntary.

In *State v. Keiper,* 8 Or App 354, 493 P2d 750, Sup Ct *review denied* (1972), where defendants voluntarily agreed to polygraph examinations and the ex-

aminations resulted in confessions, we held that the facts there justified the court's finding that the confessions were voluntary and not coerced by the polygraph examinations. In that case the court allowed no evidence about the polygraph examinations to go before the jury, however.

Among cases upon which we now rely, which have held such evidence may be presented to the jury, are: *Tyler v. United States,* 193 F2d 24 (DC Cir 1951), *cert denied* 343 US 908 (1952); *Grace v. State,* 48 Ala App 507, 266 So2d 310 (1972); *Roberts v. State,* 195 So2d 257 (Fla Ct App 1967); *Johnson v. State,* 166 So2d 798 (Fla Ct App 1964); *The People v. Lettrich,* 413 Ill 172, 108 NE2d 488 (1952); and *Gasway v. State,* 157 Tex Crim 647, 248 SW2d 942 (1952). *See also* cases collected in Annotation, 23 ALR2d 1306, 1310, § 5 (1952), and ALR2d Later Case Service.

*Johnson v. State,* supra, a Florida case, is an often-quoted decision. In it the Florida Court of Appeals said:

"* * * The established rule that neither the result of a polygraph examination nor any allusion to such an examination to imply a certain result is admissible or proper [citing authority], does not, in our view, label the polygraph a tree whose every fruit is forbidden.

"* * * * *

"Perhaps the most frequent instances of a jury being advised of a defendant's having taken a lie detector test are in cases involving confessions or admissions procured in anticipation of, during or subsequent to administration of a lie detector examination. It is well established that the mere fact that a lie detector examination may have been involved in procuring a confession does not render the confession inadmissible. [Citing authorities.]

However, if the defendant is forced to submit to the examination or if the methods of examination are such as to constitute actual or psychological coercion the resulting confession may well be found involuntary. [Citing authority.] * * *

"Necessarily, when a confession procured during or as a result of a lie detector examination is challenged, the facts surrounding the confession will be disclosed. If the court determines the evidence competent, these same facts—including the fact that the defendant was subjected to a lie detector—may be disclosed to the jury as bearing on the confession's credibility. See People v. McHenry, supra, Traub v. State [150 Conn 169, 187 A2d 230 (1962)]. State v. DeHart, 242 Wis. 562, 8 N.W.2d 360 (1943). Indeed, it has been held error to limit defense efforts to explore the details of a lie detector examination eventuating in a confession. People v. Lettrich, 413 Ill. 172, 108 N.E.2d 488 (1952)." 166 So2d at 801-3.

In *Tyler v. United States,* supra, 193 F2d at 31, where the polygraph expert testified in much the same way about his colloquy with the defendant as the test was taken as the expert at bar did, the court said:

"* * * This court has held the results of a lie detector test to be inadmissible. [Citing authority.] We do not mean to impair that ruling. But here the circumstances are different. The evidence had a material bearing upon the conditions leading to Tyler's confession and was relevant upon the vital question as to whether the same was voluntary * * *."

The *Tyler* decision has been noted as an established rule in *United States v. Wainwright,* 413 F2d 796, 803 (10th Cir 1969), *cert denied* 396 US 1009 (1970), and *United States v. Hart,* 344 F Supp 522, 523 (EDNY 1971). It was similarly recognized but distinguished from the case there under consideration in *United States v. Zeiger,* 350 F Supp 685 (DDC), *reversed* 475

F2d 1280 (DC Cir 1972).[2] Our review of the facts and law indicates that there is logical reason and ample authority for the ruling of the trial court at bar. Therefore, we find it not in error.

■ The defendant's second claim of error relates to instructions concerning the defense of extreme emotional disturbance under ORS 163.125 (1)(b) and (2) which state:

"(1) Criminal homicide constitutes manslaughter when:

"* * * * *

"(b) A homicide which would otherwise be murder is committed under the influence of extreme emotional disturbance, which disturbance is not the result of his own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation; or

"* * * * *

"(2) For the purposes of paragraph (b) of subsection (1) of this section, the reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be.

"* * * * *"

---

[2] United States v. Zeiger, 350 F Supp 685 (DDC), *reversed* 475 F2d 1280 (DC Cir 1972), is a case in which the United States District Court, District of Columbia ruled (apparently for the first time, or one of the first times, in a United States District Court) that polygraph test results are admissible as substantive evidence if the expert who administered the test is shown to be highly qualified and there is opportunity for thorough cross-examination of the expert. The *court said,* however, that the expert, while he could give the results of the examination as substantive evidence, could not give his opinion as to guilt or innocence of a defendant. The district court decision was reversed by the United States Court of Appeals, District of Columbia Circuit without comment regarding the favorable consideration the district judge had given to the progress that has been made in the science of polygraph examination.

The instructions to which exceptions were taken after the jury retired relating to extreme emotional disturbance were lengthy but generally couched in the terms of the statute with the exception that before the words "reasonable explanation" the court in several places added the word "objective." This made the instruction read that the explanation which the jury could accept for an "extreme emotional disturbance" was an "objective, reasonable explanation." In these instructions the court also said, while it was instructing about the meaning of "extreme emotional disturbance":

"* * * The fact that the defendant may have been mentally or emotionally disturbed or the fact that he may be an emotionally disturbed person at all times is not material. You must find that at the time in question he was under the influence of an extreme mental[⑨] or emotional disturbance, as opposed to a mere mental or emotional disturbance. If you do not find the disturbance to have been extreme, then this defense is not available to the defendant."

The first sentence of the above quotation was excepted to as well as the use of the word "objective" as mentioned above.

The state contends that the entire defense of extreme emotional disturbance under ORS 163.125 should have been removed from consideration by the jury because it was not established by any evidence. Hence, the state contends that if there was error it was harmless. This argument overlooks the fact that there was much psychiatric testimony on the subject which could be interpreted various ways. Further, we

⑨ The term "mental or" before "emotional disturbance" is not in the statute. From colloquy reported in the transcript, it appears this term was added to the instruction by the court at the urging of defense counsel. No claim of error has been predicated on this addition to the statute.

said in *State v. Corbin,* 15 Or App 536, 550, 516 P2d 1314 (1973), Sup Ct *review denied* (1974) (decided after the trial of the case at bar):

"* * * [T]he statutory scheme puts the decision as to the reasonableness of the explanation for the extreme emotional disturbance completely in the hands of the jury.[2] *Cf. State v. Siens,* 12 Or App 97, 504 P2d 1056, Sup Ct *review denied* (1973).

"* * * * *

"[2] We note that Oregon State Bar, Uniform Jury Instruction No. 410.17 is consistent with our viewpoint."

The instructions given were far from models, and the intention of the legislature may have been minimally misinterpreted with the addition of the word "objective" to the words of the statute. For instance, in the Commentary to the Proposed Oregon Criminal Code 89, Art 10, § 89 (1970), published by the Criminal Law Revision Commission, with reference to this section the Commission said:

"* * * The draft section also introduces a larger element of subjectivity, though it is only the actor's 'situation', and 'the circumstances as he believes them to be,' not the defendant's scheme of moral values, that are thus to be considered. The ultimate test, however, is objective; there must be 'reasonable' explanation or excuse for the actor's disturbance. Thus, the draft retains a certain degree of the objective standard but turns away from the present Oregon law * * *."

If such an explanation as this were given to a jury, it would be more apt to confuse than help.

With reference to the part of the instruction we have quoted concerning the definition of "extreme emotional disturbance," to which exception was taken, we think that the definition all together—that is, with-

out isolating the one sentence to which defendant excepted—explains with sufficient accuracy what the court undertook to explain.

■ When exceptions were taken to these particular instructions by defense counsel after the jury had retired, the court vigorously protested that it had given both defense counsel copies of them three weeks before they were used and that the court had expressly requested that, if there were matters that counsel objected to, the court be notified. It is obvious that there was no response to this request with reference to the matters to which the exceptions were taken, rather, that defense counsel were prepared in detail to take the exceptions at the time they did. This type of mouse-trapping of a trial judge is just cause for his protest. Nevertheless, if there was serious error in the instructions, the defendant's right to a fair trial under proper law instructions by the court to the jury should not be impaired thereby in a case where the charge is as serious as here. *See* discussion in *State v. Avent,* 209 Or 181, 302 P2d 549 (1956). We note that after all of the exceptions were taken to the "extreme emotional disturbance" instructions the court said:

"* * * Do you want them [the jury] further instructed, or do you want the record to be as it is?

"MR. FOSS: Well, I don't feel that the jury should receive any additional instructions on that aspect of the case, frankly, your Honor, at this juncture.

"THE COURT: All right. I have made the offer. You may have your exception.

"MR. FOSS: Thank you."

■ In *State v. Avent,* supra, citing *Kuhnhausen v. Stadelman,* 174 Or 290, 311, 148 P2d 239, 149 P2d 168 (1944), the court noted that the purpose of requiring

exceptions is to give the trial judge a chance to correct error. If a defendant refuses the opportunity for correction, he must have little faith in his claim that he has been prejudiced.

■ In view of the offer to reinstruct by the court, and counsel's refusal of that offer, coupled with the minimal character of error in the instruction, if there was any at all, we conclude that this assignment lacks reason for ordering a new trial.

Affirmed.