Argued December 2, 1974, reversed and remanded
January 30, 1975

# STATE OF OREGON, *Respondent, v.*
# ROGER LYNN GREEN, *Petitioner.*

### 531 P2d 245

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for petitioner.

*Robert E. Brasch,* District Attorney, Coquille, argued the cause and filed the brief for respondent.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL, BRYSON and SLOPER, Justices.

TONGUE, J.

Defendant was convicted of murder for the

shooting of two girls in Coos County, in violation of ORS 163.115. In addition to a plea of not guilty, defendant contended that he was suffering from "extreme mental or emotional disturbance" at the time of the shootings, so as to reduce any crime from murder to manslaughter by reason of ORS 163.125.[①]

The primary error assigned by defendant on appeal to the Court of Appeals was that the trial court erred in overruling defendant's objections to the offering by the state of "polygraph evidence," including not only the fact that defendant had taken a polygraph, or "lie detector," test prior to making a confession offered in evidence by the state, but also the results of that test and details of the test, including questions asked during that examination. The Court of Appeals affirmed the conviction, 18 Or App 310, 525 P2d 205 (1974). We granted a petition for review because of the importance of this subject.

*The facts.*

It is not necessary to state all of the detailed facts of this sordid crime. The bodies of the two teenage girls were found near a logging road in a wooded area near Coquille, each killed with a single .22 caliber rifle bullet. Their clothes had been removed and were found at a garbage dump some distance away.

Upon receiving anonymous information that defendant had been seen in that area, the state police officers went to see him and he gave them an account of his activities on that day. In discussions with defendant the officers asked if he would be willing to take a polygraph test, to which he agreed. A test was

---

[①] Defendant also pleaded the defense of mental disease or defect under ORS 161.295 and 161.300.

then given to him by a deputy sheriff, after which he was allowed to leave.

The next day a polygraph expert from the state police arrived and defendant agreed to take a second polygraph test. At the conclusion of that test that officer told defendant that he thought that the defendant was lying and needed help. Defendant then broke down and cried and confessed that he had killed the girls. His confession was then recorded, after which it was transcribed and signed by the defendant, all in the presence of several witnesses. After the confession defendant went with the officers to the scene of the crime, where he assisted in its re-enactment. At that time he again admitted that he was "the one" who shot the two girls.

On various subsequent occasions defendant made other admissions to various officers and other persons in which he stated his version of additional details of the crime, including his reasons for shooting the girls. According to defendant's statements, he had encountered the two girls in a park. They wanted him to buy them some beer, which he did. They then wanted him to take them to a place where they could "skinny dip," which he did. The girls then, according to defendant, rubbed their bodies against him and offered him sex if he would get them some "dope." He then became angry and frustrated, but refused to do so. The three then got into his pickup truck and drove away. One of the girls then saw his .22 rifle in his truck and wanted to do some target shooting. After some target shooting, according to defendant, the girls taunted him for refusing to get them some "dope," told him "no dope, no sex" and called him a "red neck," among other things. He then shot them. Later, he

took off their clothes "to make it look like rape" and took the clothes to the dump.

In his original confession defendant said that he "used to lose his temper a lot." Shortly after making his confession, defendant blamed his father for what he did, saying that his father had mistreated him and had called him names; that the girls called him names and talked to him "the way my father used to talk to me"; that his father then "got to him" and that was his explanation for shooting the girls.

Later, defendant explained his reasons for shooting the girls on the basis that he had become sexually aroused, frustrated and angry by the conduct of the girls. Previously, however, defendant stated that he did not recall being angry; that there had been no argument or anything that provoked him into shooting the girls; that he had not been sexually aroused by them; and that they had not "propositioned" him.

*The preliminary hearing.*

In *State v. Brewton*, 238 Or 590, 600-03, 395 P2d 874 (1964), this court adopted the so-called "Massachusetts rule" relating to the procedure to be followed for proof that a confession by a defendant in a criminal case was given voluntarily. For the purpose of satisfying the requirements of that rule, a preliminary hearing was held in advance of trial, rather than to interrupt the trial before the jury by "in camera" proceedings. The purpose of that hearing was to determine whether defendant's confession was given voluntarily so as to be admissible in evidence at the trial, subject to the further determination by the jury whether the confession was given freely and voluntarily.

At that hearing, as well as at the trial itself, the district attorney proceeded upon the assumption that under *Brewton* he had both the right and the duty to offer in evidence "the totality of the circumstances surrounding an accused's decision to confess his criminal conduct," and that this included not only the fact that defendant had taken a polygraph test immediately prior to his confession, but many of the details of both polygraph tests, including specific questions asked by the experts conducting the tests and defendant's answers to these questions, as well as statements by the experts to the defendant that his reactions to certain questions indicated that he was lying. At that hearing the district attorney also offered in evidence testimony relating to most, if not all, of the numerous conversations between the defendant and various police officers and other persons covering a period of several weeks, including various admissions and other statements by defendant both before and after his formal confession.[2]

As a result, the preliminary hearing, which began on August 14, 1973, took six days, extending over a period of several weeks. The state offered 18 witnesses, several of whom were recalled on subsequent dates. The hearing was not concluded until October 19, 1973.

At the conclusion of that hearing defendant's counsel informed the court that they would object at the trial to the admission of both the fact that polygraph tests had been taken by defendant before he confessed and also the results of such tests. The trial

_____

[2] In State v. Brewton, 238 Or 590, 604, 395 P2d 874 (1964), we said that "our holding is applicable with equal force to all alleged admissions of the defendant."

judge then ruled that the fact that polygraph tests had been taken could be shown by the state at the trial, but not the results of the tests. He also ruled that the state would not be permitted to show "the actual tapes that were taken" during the polygraph tests, but that the defense could do so if it desired.

*The trial.*

The first witness offered by the state was a state police officer who testified that in the course of his investigation of the killings he asked defendant if he would submit to a polygraph test. Defendant's counsel renewed his objections upon the ground that evidence of polygraph tests is not admissible. The trial judge then ruled again that the fact that defendant had submitted to a polygraph test could be shown as an "important circumstance" of the confession, but that he was "not going to permit the polygraph test or any bolstering of the officer's testimony based upon the polygraph results." Defendant asked for and was granted a continuing objection.

The state's attorney, however, then proceeded to offer in evidence the tape of the recorded proceedings during the first polygraph examination, including the explanation to defendant of the polygraph equipment by the officer conducting the examination; his instructions to defendant at the beginning of the examination; specific questions asked, including such questions as whether defendant knew whether the girls were shot with a rifle, whether he knew that their clothes had been found at the dump, whether he knew who had killed the girls and whether he did so; and defendant's "no" answers to each of these questions. That tape also included statements by the officer to defendant

that the "graph" showed that his blood pressure "really shot up" in answering some of these questions.

The state then offered testimony that the next day defendant agreed to take a second polygraph test and that after that test defendant made a confession, which was first "taped" and then transcribed and signed by him. The transcript of that confession was then read to the jury.

The two officers who conducted the two polygraph examinations also testified, among other things, that the purpose of the tests was to "determine whether there was any deception" and, if so, to get defendant to confess; that at the conclusion of the second examination the officer told defendant that he felt that defendant was lying and that defendant "needed help," after which defendant broke down and cried, saying that he had "needed help for a long time"; and that he then confessed. In the course of that testimony the state was also permitted to offer in evidence some of the questions asked during the second polygraph examination, including a question whether defendant had seen the girls naked, which defendant denied at that time, but which, in the opinion of the officer conducting the polygraph examination, was a "key" question.

At that point, after defendant's counsel had made a further objection, the trial judge warned the state's attorney, saying that he had previously ruled "that you're not to discuss the polygraph test in any way, and you're getting perilously close to doing that." The state then offered testimony of the various subsequent admissions by defendant, including various inconsistent statements.

Defendant did not testify on his own behalf.

The defense offered the opinion testimony of two psychiatrists, however, based upon what defendant had told them during their interviews with him, among other things. They testified that defendant had an "emotionally unstable personality" and an "explosive personality disorder"; and that he had been sexually excited, frustrated and angry when he shot the girls. One of them also testified that defendant "was under extreme emotional disturbance at that time." The other said that he "was undoubtedly under considerable stress." Defendant also offered testimony of witnesses who described the bad relationship between defendant and his father.

*The opinion by the Court of Appeals.*

In affirming defendant's conviction the Court of Appeals stated (18 Or App at 314) that:

"* * * The court was careful throughout the trial to point out and require that the results shown by the polygraph machine tracings should not be brought into the court or referred to as evidence. This was in compliance with the general rule rejecting polygraph test results as evidence except under stipulation. * * *"

That court observed, however, that:

"Obviously, where the expert tells the jury that he informed the defendant that he was not believed, from that, and the observations about the questions that caused the greatest reaction, the jury will infer that the results of the polygraph test show defendant to have been untruthful, regardless of whether the jury sees the tracing from it. In reality then, there is a very thin line between what the court ruled could not be told in this regard and what the jury actually did hear."

Nevertheless, the Court of Appeals concluded that:

"* * * [U]nder case law it appears to be gen-

erally established that evidence like that received at bar is admissible as part of the 'totality of the circumstances' surrounding a confession so that the jury may have all of the evidence in order to make its determination as to whether the confession is voluntary."

After considering decisions by other courts, it was held (18 Or App at 317) that:

"* * * Our review of the facts and law indicates that there is logical reason and ample authority for the ruling of the trial court at bar. Therefore, we find it not in error."

■ After reviewing the voluminous record in this case, over 2,600 pages in length, we have concluded that the Court of Appeals was in error. First, the opinion of that court is in error in its assumption that the "ruling" by the trial court to the effect that the "results of the polygraph tests should not be offered in evidence or referred to" was adhered to by the state during the trial of that case. On the contrary, we find that although the polygraph tracings were not offered in evidence, detailed testimony was received relating to the conduct of both examinations, including specific questions asked, together with the testimony of the polygraph expert that defendant lied in answering those questions. Thus, even assuming that the initial "ruling" of the trial court was "not in error," testimony was received, over objection by defendant, which clearly informed the jury of the "results" of the polygraph tests.

In addition, we are concerned with the more fundamental question whether, as held by the trial court and the Court of Appeals, the fact of the taking of a polygraph test prior to a confession may be shown by the state during the trial of a criminal case and, if

so, under what circumstances. That question has never before been directly considered by this court.[9]

*Evidence of polygraph tests—in general.*

■ Despite the fact that the polygraph, or "lie detector," has been in use for many years, most courts still refuse to admit the results of polygraph tests of a defendant in a criminal case as substantive evidence on the issue of his guilt or innocence.[10] The principal reason for rejecting such evidence is that the poly-

[9] Cf. In re Herbert D. Black, 251 Or 177, 191, 444 P2d 929 (1968). See also State v. Keiper, 8 Or App 354, 358-59, 493 P2d 750, *rev denied* (1972), in which the Court of Appeals, in affirming a conviction based upon a confession made after a voluntary submission to a polygraph test, held that in determining the voluntariness of a confession the "totality of the circumstances" must be considered. In that case, however, the trial court did not allow either the fact of the taking or the results of the polygraph test to be introduced as evidence in the trial before the jury and neither party made an offer of such evidence. Cf. State v. Harris, 241 Or 224, 236-242, 405 P2d 492 (1965), involving statements made under hypnosis or by use of "truth serum."

[10] See Annot., 23 ALR2d 1306 (1952); 2 Jones on Evidence 724, § 14:48 (6th ed 1972); Inbau & Reid, Criminal Interrogation & Confessions 197 (2d ed 1967); and Note, Evidence — How Some Courts Have Learned to Stop Worrying & Love the Polygraph, 51 NC L Rev 900 (1973). See also discussion in State v. Arnwine, 67 NJ Super 483, 171 A2d 124, 127-31 (1961). But see United States v. Zeiger, 350 F Supp 685 (D DC 1972); United States v. Ridling, 350 F Supp 90 (ED Mich 1972); and People v. Kenny, 167 Misc 51, 3 NYS2d 348 (County Ct 1938), overruled *sub silentio*, People v. Forte, 279 NY 204, 18 NE2d 31 (1938).

The admissibility of lie detector tests has been argued extensively in recent law reviews and journals. Some are now in favor of relaxing the rule against admitting such evidence. See, e.g., Note, The Polygraph Revisited: An Argument for Admissibility, 4 Suffolk U L Rev 111 (1969); Note, The Role of the Polygraph in Our Judicial System, 20 SC L Rev 804 (1968); Note, The Emergence of the Polygraph at Trial, 73 Colum L Rev 1120 (1973); Note, Pinocchio's New Nose, 48 NYU L Rev 339 (1973); Inbau & Reid, The Lie-Detector Technique; A Reliable and Valuable Investigative Aid, 50 ABAJ 470 (1964); and Pfaff, The Polygraph—An Invaluable Judicial Aid, 50 ABAJ 1130 (1964). See also Brasch, The Polygraph Confession, 9 Will L J 54 (1973).

graph has not yet attained general scientific acceptance as a reliable and accurate means of ascertaining truth or deception, as required as a prerequisite to judicial acceptance of new scientific techniques and devices.[6] Thus, the reluctance of the courts to accept lie detector evidence has not been entirely due to judicial inertia.[7]

Nevertheless, polygraph examinations, or "lie detector" tests, are widely used today by police and by prosecutors in interrogating persons suspected of crimes, both as a means of clearing suspects who are

---

Others advocate retaining the presently established rule rejecting this evidence. See, e.g., Note, Problems Remaining for the "Generally Accepted" Polygraph, 53 Boston L Rev 375 (1973); Note, New Trends in Admissibility of Polygraph Tests & Spectograph Voiceprint Identification Evidence, 3 Memphis St U L Rev 282 (1973); Burkey, The Case Against the Polygraph, 51 ABAJ 855 (1965); Levin, Lie Detectors can Lie, 15 Labor L J 708 (1964); and Laymon, Lie Detectors—Detection by Deception, 10 SD L Rev 1 (1965).

[6] McCormick on Evidence 504-07 (2d ed 1972); Annot., 23 ALR2d supra note 4 at 1308; and State v. Valdez, 91 Ariz 274, 371 P2d 894, 897 (1962), discussing some of the difficulties in accurate diagnosis of deception by lie detector techniques. See also discussion by this court in In re Herbert D. Black, supra note 3 at 186-90, including authorities cited.

Indeed, there is even a split of authority upon the question whether such evidence is admissible in a criminal case on stipulation of the parties, apparently because of the potential prejudicial effect upon the jury. See Romero v. State, 493 SW2d 206, 211 (Tex Crim App 1973), and cases cited therein. See also State v. Bennett, 98 Adv Sh 1895, 1898, 17 Or App 197, 521 P2d 31 (1974); State v. Valdez, supra; State v. McDavitt, 62 NJ 36, 297 A2d 849, 855 (1972); Note, The Admissibility of Polygraph Evidence Pursuant to Stipulation in Criminal Proceedings, 5 Akron L Rev 235 (1972); and Inbau & Reid, Criminal Interrogation & Confessions, supra note 4.

[7] State v. Valdez, supra note 5 at 897.

Cf. ORS 659.225, providing that:

"No person, or agent or representative of such person, shall require, as a condition for employment or continuation of employment, any person to take a polygraph test or any form of so-called lie detector test."

innocent and as a means of obtaining confessions, provided that such persons agree to voluntarily submit to such examinations.[7] In turn, it is generally held that confessions are not rendered inadmissible because given following the taking of polygraph examinations, provided that they are shown to have been given freely and voluntarily.[8]

The question remains, however, whether in such a case the state may offer in evidence before the jury the fact that the confession was given following a polygraph examination and, if so, whether the state may also offer in evidence either the results of the examination or details relating to the examination.

*Neither the fact of a polygraph test, its results, nor the details of such an examination may ordinarily be offered in evidence by the state in laying the founda-*

---

[7] See 3A Wigmore on Evidence 946, § 999 (Chadbourn rev 1970); and Note, Hypnosis, Truth Drugs, and the Polygraph, 21 U of Fla L Rev 541, 547-48 (1969). It has been estimated that confessions have been obtained in from 50 to 85 per cent of the cases in which polygraph recordings indicate deception. Wicker, The Polygraph Truth Test and the Law of Evidence, 22 Tenn L Rev 711, 714 (1953). This success may be the result of impressing upon the subject the futility of trying to conceal facts (3A Wigmore, *supra*, 946, § 999) and his feeling, after taking the examination, that "the cat is out of the bag." Richardson, Modern Scientific Evidence 317-18, § 10.7 (2d ed 1974).

[8] 3 Wigmore, *supra* at 496, § 841a, and Annot., 23 ALR2d, *supra* Note 4 at 1310. See also 8 Wigmore on Evidence 406, § 2266 (McNaughton rev 1961); Wharton's Criminal Evidence 252 n.21, § 630, and 471, § 684 (13th ed 1973); and United States v. McDevitt, 328 F2d 282, 284 (6th Cir 1964), and cases cited therein. The admissions of confessions following polygraph examinations has been denied, however, when the conduct of the expert who conducted the examination has been abusive. See Bruner v. People, 113 Colo 194, 156 P2d 111 (1945); and Note, The Polygraph Technique; A Selective Analysis, 20 Drake L Rev 330, 344 (1971). See also Note, 21 U of Fla L Rev, *supra* note 7 at 547-48; Bailey & Rothblatt, Investigation and Preparation of Criminal Cases 296, § 375 (1970); and Richardson, *supra* note 7 at 317-18.

*tion for the admission of a confession in evidence during the trial of a criminal case.*

■ In considering the admissibility of evidence relating to polygraph tests prior to confessions it must be kept in mind that the primary question of fact to be decided by the jury is whether the confession was voluntary. It must also be kept in mind that on this question, as on other questions in criminal cases on which the state has the burden of proof, the state has the right to offer evidence that is relevant to that question, including the circumstances under which the confession was given, subject to the usual qualification that the probative value of the evidence is not outweighed by the danger of prejudice to the defendant.[⊚]

In considering this question it must also be remembered that in the usual criminal case the credibility of the defendant and of his version of the facts relating to the crime for which he has been charged is also one of the primary questions to be decided by the jury. This may be true even though the defendant does not testify. Thus, in this case, although the defendant did not testify, the contention by his counsel that he was acting under "extreme mental or emotional disturbance" when he shot the girls depended upon the credibility of his version of the facts, as told by him to police officers and to the psychiatrists.

■■ As previously stated, evidence of the results of polygraph tests is not admissible as substantive evidence to prove that a person has lied or told the truth. Nevertheless, the jury is likely to infer from evidence of the fact that a criminal defendant was the

---

⊚ See McCormick on Evidence, *supra* note 5 at 438-39, § 185; State v. Freeman, 232 Or 267, 273-74, 374 P2d 453 (1962); and State v. Harrison, 253 Or 489, 491, 455 P2d 613 (1969).

subject of a polygraph test before making a confession that he lied in response to questions asked during a polygraph test and that he confessed because he was caught lying by the polygraph. As a result, there is danger that such evidence may unduly prejudice the jury in its consideration of the credibility of such a defendant.[10]

The same is also true, in our opinion, and for the same reasons, of evidence of the results of a polygraph examination and evidence relating to the details of a polygraph examination, from which the jury is even more likely to draw the same inferences.

■ For these reasons, it is our opinion that the danger of prejudice from the impact of such evidence upon the question of the credibility of a defendant is so great as to ordinarily outweigh the probative value of such evidence as one or more of the circumstances which the state may properly offer in evidence in laying the initial foundation for the admission of a confession during the trial of a criminal case.

In addition, it must be recognized that there may be circumstances relating to the conduct of a polygraph examination prior to the giving of a confession which the defendant may desire to urge as grounds in support of a contention that the confession was not given voluntarily, but was the product of coercion and psychological pressure.[11]

---

[10] See State v. Arnwine, *supra* note 4 at 131; People v. Wochnick, 98 Cal App 2d 124, 219 P2d 70 (D Ct App 1950). See also People v. Andrews, 14 Cal App 3d 40, 45, 92 Cal Rptr 49, 52 (1970), and cases cited therein. In addition, see cases cited infra in note 15. Cf. State v. Perry, 274 Minn 1, 142 NW2d 573, 580 (1966). But see Johnson v. State, 166 So 2d 798, 804 (Fla App 1964).

[11] See cases and authorities, *supra* note 8. See also People v. Lettrich, 413 Ill 172, 108 NE2d 488, 491 (1952).

██ For all of these reasons, we agree with the rule as stated by Reid & Inbau, Truth & Deception: The Polygraph ("Lie-Detector") Technique 254 (1966), as follows:

"In laying the legal foundation for the admissibility of a confession obtained before, during, or after a Polygraph examination, a prosecuting attorney is confronted with a task requiring considerable caution. *He must seek to avoid any reference by prosecuting witnesses to the results of the Polygraph examination or even to the fact of the examination itself.* The procedure that should be followed is to introduce as a witness the examiner, or someone else to whom the confession may have been made or repeated, and through him lay the foundation for the admissibility of the confession by merely proving its voluntary character (i.e., the absence of any threats, force, or objectionable promises); and *all this without any mention of the fact that a Polygraph had been used or contemplated.* In this way the prosecution will avoid any danger of reversible error occasioned by reference to the Polygraph. *The choice, therefore, will rest with the defense attorney as to whether or not he wants to inject the Polygraph issue into the case* for the purpose of attempting to show that it or the technique was a coercive factor which compelled the defendant to confess." (Emphasis added)

Although there are few other authorities directly on point, this rule, we believe, is the better one.[⑳] We recognize, however, that there are some courts which have appeared to distinguish between the fact

[⑳] See Kaplan, The Lie Detector: An Analysis of its Place in the Law of Evidence, 10 Wayne L Rev 381, 384, 389 (1964), and Note, The Polygraph Technique: A Selective Analysis, 20 Drake L Rev 330, 344 (1971). See also State v. Arnwine, *supra* note 4 at 129-32.

Cf. State v. Varos, 69 NM 19, 363 P2d 629, 631 (1961); United States v. McDevitt, 328 P2d 282, 284 (6th Cir 1964); and Leeks v. State, 245 P2d 764, 771 (Okla Crim App 1952).

of the polygraph test and the results of such a test[⑳] and some which have affirmed convictions in cases in which the results of such examinations have been received in evidence, although under different circumstances.[㉑]

■ It follows, in our opinion, that when the state undertakes to lay the foundation for the introduction into evidence of a confession at the trial of a criminal case by offering evidence to establish that the confession was given voluntarily, it may not at that time offer evidence of the fact, results or details of a previous polygraph examination. If, however, when the confession is offered in evidence, the defendant then objects to the confession upon the ground that the confession was not voluntary because of a preceding polygraph examination, the state may then offer in evidence not only the fact that the confession was given following a polygraph examination, but also such details of the polygraph examination, including evidence which may reveal the results of the examination, as may be relevant upon the question whether the confession was given voluntarily.

■ The state may also offer such evidence in rebuttal, even if a defendant does not object when his confession is offered in evidence, if he then offers evi-

---

[⑳] See Johnson v. State, *supra* note 10. See also State v. Melvin, 65 NJ 1, 319 A2d 450, 459 (1974), and Commonwealth v. Camm, 443 Pa 253, 277 A2d 325, 334 (1971). Cf. People v. McHenry, 204 Cal App 2d 764, 22 Cal Rptr 621, 624 (1962), and Lusby v. State, 217 Md 191, 141 A2d 893, 895 (1958).

[㉑] See Tyler v. United States, 90 US App DC2, 193 F2d 24 (DC Cir 1951), cited by the state. Cf. State v. DeHart, 242 Wis 562, 8 NW2d 360 (1943), and State v. Traub, 150 Conn 169, 187 A2d 230, 236 (1962).

Johnson v. State, *supra* note 10, also cited by the state, does not hold that the results of the test can be admitted into evidence. The remaining cases relied upon by the state also do not support that position.

dence to the effect that the confession was not given voluntarily because of a preceding polygraph examination or because of other facts of such a nature as to make it appropriate for the state to offer such evidence in order to show that the confession was given voluntarily.

■ In this case, although defendant's confession was made following a polygraph examination, he was again warned of his constitutional rights. He then not only repeated the confession in detail in the presence of other witnesses, but then signed a transcript of the confession, including the statement that it was given freely and voluntarily. And when that confession was offered in evidence no objection was made by defendant upon the ground that it was not given voluntarily, either because of the preceding polygraph examination or for any other reason. The only objection to the confession was that defendant had not been properly informed of his rights, a contention without merit and one not assigned as error by the defendant on this appeal. On the other hand, defendant had previously objected to the introduction by the state of any "polygraph evidence."

Under these circumstances, we hold that it was error for the state to offer in evidence not only the fact of the two preceding polygraph examinations, but many of the details of both of the preceding examinations, including specific questions to which defendant gave answers which were untruthful answers, according to the polygraph.

The state contends that "under *State v. Brewton, supra,* until and unless the defendant was willing to waive the issue of voluntariness" the prosecution "had

no choice but to disclose all the circumstances surrounding defendant's decision to confess his crimes." We do not so construe *Brewton.*

We held in *Brewton* (238 Or at 603) that "[T]he court in the absence of the jury should then hear all the evidence relevant to the voluntariness of the confession" and that "[T]hereafter * * * the state must again establish the voluntariness of the confession before the jury and the jury will hear all the evidence offered on that issue." We did not hold, in *Brewton,* however, that the state had the right to offer all evidence which, in its view is relevant on that question and regardless of prejudice to the defendant.

On the contrary, we said in *State v. Zimmerlee,* 261 Or 49, 54, 492 P2d 795 (1972):

"* * * Although we have held that the state may prove its case 'to the hilt,' that privilege is not open to the state in circumstances where its exercise would unnecessarily expose a defendant to prejudice. * * *""

For reasons previously stated, if a defendant desires to offer evidence relating to a preceding polygraph examination, he may do so. Or if a defendant chooses to object to the admission in evidence of a confession upon the grounds that it was not voluntary because of a preceding polygraph test, the state may then do so. In other words, the choice whether evidence relating to a previous polygraph examination is to be received is ordinarily a choice to be made by the defendant.

By this decision, however, we do not mean to hold that at the "in camera" hearing before the court, as required by *Brewton,* to determine whether a confession made following a polygraph examination was

given voluntarily, so as to be admissible in evidence, the state may not show that fact, among other circumstances. That question, however, is not before the court in this case.

*The error in this case was not "harmless."*

It is also contended by the state that any error in the admission of polygraph evidence was "harmless" error, even upon the issue of the credibility of defendant, because "the defendant did not testify and voluminous, independent, non-polygraphic evidence overwhelmingly demonstrated [that] defendant had consistently lied to the police."

 We might agree with the state if it were our function to pass upon the credibility of this defendant. We cannot say, however, that there was "little, if any likelihood" that the jury would have rejected the contention by the defense that defendant acted under an "extreme mental and emotional disturbance" when he killed the two girls, as supported by the statements subsequently made by him to the police officers and to the psychiatrists, if it had not been for what the jury could well have considered to be devastating proof by the polygraph examination that defendant was a liar, with the result that these subsequent statements were untrue.⑩ Accordingly, we cannot say that

---

⑩ See State v. McLean, 255 Or 464, 479, 468 P2d 521 (1970); State v. Foye, 254 NC 704, 120 SE2d 169, 173 (1961); and State v. Varos, *supra* note 12. See also Leeks v. State, *supra* note 12, and cases cited *supra* note 10.

Cf. State v. Driver, 38 NJ 255, 183 A2d 655, 658 (1962). But see State v. Melvin, *supra* note 13; and State v. Refuge, 264 La 135, 270 So 2d 842 (1972).

It is also contended by the state that any error in its offering of polygraph evidence was not prejudicial because subsequently, near the end of the trial, defense counsel stipulated that

the error in this case was not prejudicial to defendant's defense that he acted under an "extreme mental or emotional disturbance," within the terms of ORS 163.125, so as to require a reduction of the charge from murder to manslaughter.[16]

■ We agree, however, that defendant's guilt of either murder or manslaughter was established by overwhelming evidence. It was also conceded, in effect, that defendant was guilty of either murder or manslaughter. Thus, although defendant did not testify, the testimony offered on his behalf, including that of his expert witnesses, based upon what they had been told by the defendant, was to the effect that he had killed the two girls, but that in doing so he was acting under "extreme mental or emotional disturbance." This was also the argument to the jury on defendant's behalf, in which defendant's counsel stated that "the only issue in this case is: Is it murder or is it manslaughter?"[17]

two of the state's witnesses, together with the defendant himself, submit to a polygraph examination upon the question whether certain testimony by those witnesses was true or false. At the time of that stipulation, however, the state had already been permitted to offer in evidence, over defendant's objections, voluminous evidence relating to the previous polygraph tests. Under these circumstances we cannot say that this subsequent stipulation would have been entered into by defense counsel except for the previous admission of evidence to which defendant had previously objected.

[16] On the subject of "extreme mental or emotional disturbance," see Arthur, Homicide, Assault, Kidnapping and Related Offenses, 51 Or L Rev 459, 472 (1972), and State v. Siens, 12 Or App 97, 102, 504 P2d 1056 (1973).

[17] This also eliminates the question whether defendant had a "mental disease or defect" under ORS 161.295 and 161.300, as pleaded by him as an affirmative defense. Indeed, even the testimony of defendant's expert witnesses, if believed, was insufficient to establish that defense.

For the reasons previously stated, we must remand this case for a new trial. The new trial, however, will be limited to the question whether at the time of killing the two girls, defendant acted under an "extreme mental or emotional disturbance," so as to be guilty of manslaughter, rather than of murder.[9]

Reversed and remanded.

---

[9] At that trial there will be no need to repeat the preliminary hearing before the trial court upon the question whether defendant's confession and other admissions were made voluntarily.