James PETERSON, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4862.

Supreme Court of Wyoming.

Oct. 13, 1978.

Harry E. Leimback and David B. Park, Casper, signed the briefs and appeared in oral argument on behalf of the appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., and Allen C. Johnson, Asst. Atty. Gen., signed the briefs. Allen C. Johnson, Cheyenne, appeared in oral argument on behalf of the appellee. William Tom Sullins, II, Deputy County and Pros. Atty., Natrona County, was present during oral argument.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

Appellant-defendant is before this court convicted by a district court jury of murder in the second degree [1] and under sentence

---

1. Section 6–4–104, W.S.1977:

"Whoever purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life."

to the Wyoming State Penitentiary for a term of not less than twenty nor more than twenty-one years. Defendant alleges trial court errors urged as sufficient to mandate reversal in each of the following areas: 1. double jeopardy; 2. diminished capacity; 3. exclusion of evidence; 4. fair trial; and, 5. sentencing. Except for remand for reconsideration of the sentence imposed, we shall affirm.

## FACTS

On July 16, 1975, the day of the homicide in question, defendant was employed as a construction superintendent with the Pullman-Kellogg Company of Pennsylvania. On or about the 12th of July, 1975, he had come to the Casper, Wyoming area to do preliminary work in preparation for construction of a 500-foot smoke stack to be constructed at a power plant near Glenrock, Wyoming. On July 16, following a morning spent with his superiors surveying the construction site, defendant and the others proceeded to a bar in Glenrock where defendant consumed approximately eight drinks. Thereafter defendant and two other employees proceeded to a Casper motel so that the two fellow employees could retrieve their luggage and proceed to the airport. At the motel, defendant took on two more drinks.

After his friends had departed, as then recalled and related by defendant, he proceeded to downtown Casper where he entered the Reef Lounge, mingled with the customers and eventually struck up an acquaintance with two or three patrons. Defendant ordered drinks for himself as well as the other eight or ten customers at the bar, and from time to time thereafter bought drinks for all persons within the establishment. Defendant estimated that during this time he consumed six additional drinks. Sometime during that time period, the deceased victim of the homicide, Ray Mora, entered the establishment. After decedent's arrival, defendant noted that his bar tab for a round of drinks for the house had increased sufficiently to cause him to

believe he was being overcharged. He complained to Max Cisneros, one of the owners; an argument ensued resulting in a return to defendant of $5.00 and a direction to leave the bar. Defendant and the two acquaintances he had met in the bar then left and eventually ended up at the Townsend Bar where defendant had one or two more drinks.

According to defendant's testimony, it was at this point he decided he should go back to the Reef Lounge and make amends, if any were necessary, since he disliked the thought of possibly having made a bad impression with a business establishment in Casper. At approximately 7:40 p. m. defendant reentered the Reef Lounge. He walked a few feet past the front door to the nearest point of the bar and started to ask for the owner, he thought to be Max Cisneros. The decedent, then tending bar, grabbed a can of animal repellent known as "Halt", a product containing capsicum (cayenne, a red, hot substance taken from a pepper plant) which when applied to body parts creates a painful, burning sensation, and sprayed defendant directly in the face. Defendant, in confusion and great pain, ran from the bar to the outside where he stopped to get his bearings. The decedent followed and, when defendant stopped, sprayed him again in the face. As defendant attempted to escape down the street, the decedent continued after him, spraying him at various times with the repellent and kicking him when he tripped and fell into the gutter. Eventually the defendant found himself at the Branding Iron Cafe where he requested a taxi be summoned and then returned to the street.

When the taxi arrived, defendant directed the driver to his motel where he picked up a revolver and then returned to the Reef Lounge, telling the driver to wait and not to worry because he wasn't going to hurt anyone; he was just going to scare him. As he reentered the lounge, defendant stopped a few feet beyond the front door, waving his gun in the air and asking for the

man who had sprayed him. He then heard a rustling from a bead-curtained alcove immediately to his left where the decedent, Mora, had concealed himself. Defendant took a step toward the curtained nook, reached over the jukebox to part the beads and at that point saw and heard the decedent spraying him again with the animal repellent. Defendant's gun discharged and Mora fell forward into the room, mortally wounded. Defendant then left the bar and entered the now driverless cab. When it became clear to defendant that the driver was absent, he abandoned the cab and proceeded to his truck which he drove to a point within a block of his motel before being stopped and arrested by Casper police. He was then taken to the police station and, approximately two hours later at 9:50 p. m., was taken to a hospital where a blood test was taken. The results of the State's test indicated that the defendant had a .19 blood alcohol content as of 9:50 p. m., which trial testimony disclosed would have been a blood alcohol level of .23 at 8:00 p. m., the approximate time of the shooting and defendant's arrest. Additional factual information will be narrated as necessary to our discussion.

## DOUBLE (FORMER) JEOPARDY

Defendant's conviction and sentence are the results of a second trial, defendant's first having ended when the jury was unable to agree on a verdict. In support of the claim that his retrial was conducted in violation of constitutional guarantees against double jeopardy, defendant raises two points which he alleges constitute reversible error: 1. no "manifest necessity" was shown of record for discharge of the first jury; and, 2. no written order was

entered of record by the district court specifying the reasons for discharge as mandated by § 7–11–211, W.S.1977.[2] With neither assertion will we agree.

■ A defendant's right not to be placed in jeopardy a second time for the same offense is specifically guaranteed by the constitutions of both Wyoming and the United States.[3] The reasoning behind such a prohibition is fundamental to our constitutional system, *United States v. Jorn*, 1971, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543:

"The Fifth Amendment's prohibition against placing a defendant 'twice in jeopardy' represents a constitutional policy of finality for the defendant's benefit in * * * criminal proceedings. A power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws. Both of these considerations are expressed in *Green v. United States*, 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957), where the Court noted that the policy underlying this provision 'is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compel-

2. Section 7–11–211, W.S.1977:
 "In case a jury shall be discharged on account of the sickness of a juror, or other accident or calamity requiring their discharge, or after they have been kept so long together that there is no probability of agreeing, the court shall, upon directing the discharge, order that the reasons for such discharge be entered upon the journal; and such discharge shall be without prejudice to the prosecution."

3. Section 11, Article I, Wyoming Constitution:
 " * * * [N]or shall any person be twice put in jeopardy for the same offense. If a jury disagree, or if the judgment be arrested after a verdict, or if the judgment be reversed for error in law, the accused shall not be deemed to have been in jeopardy."
 Fifth Amendment, United States Constitution:
 " * * * [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; * * * *"

ling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' * * * "

Yet not in every situation is the government limited to one turn at bat. If, for whatever reason, a defendant so requests and a mistrial is granted, he is deemed, absent prosecutorial bad faith or overreaching, to have waived any argument of former jeopardy to prevent a retrial, *United States v. Weaver,* 8th Cir. 1977, 565 F.2d 129, 133:

> ."As * * * stated * * * the double jeopardy clause generally would not stand in the way of reprosecution where the defendant has requested a mistrial. Only in limited circumstances, where the judicial or prosecutorial error that prompts the defendant's motion is intended to provoke the motion or is otherwise motivated by bad faith or undertaken to harass or prejudice the defendant, does the double jeopardy clause bar retrial."

See as well, *People v. Miller,* 1978, App.Div., 403 N.Y.S.2d 298; *State v. Small,* Me.1978, 381 A.2d 1130; *Cook v. State,* 1978, 281 Md. 665, 381 A.2d 671; *State v. Henderson,* 1977, 116 Ariz.App. 310, 569 P.2d 252. And even in those situations in which a defendant neither requests or acquiesces nor even specifically objects to the granting of a mistrial, a plea of former jeopardy is ineffective if incomplete termination of the trial was dictated by "manifest necessity" or to meet "the ends of public justice," *United States v. Perez,* 1824, 22 U.S. 579, (9 Wheat.), 6 L.Ed. 165:

> " * * * We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office. * * * "

See also, *State v. Castrillo,* 1977, 90 N.M. 608, 566 P.2d 1146; *State v. Irving,* Mo.App. 1977, 559 S.W.2d 301; *United States v. Mandel,* D.Md.1977, 431 F.Supp. 90. The crux of such a doctrine, simply stated, is that where "manifest necessity" is demonstrated, "the public's interest in fair trials designed to end in just judgments," *Wade v. Hunter,* 1949, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974, outweighs a defendant's "valued right to have his trial completed by a particular tribunal," *Illinois v. Somerville,* 1973, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425, as well as his interest in avoiding retrial for the same offense, *United States v. Dinitz,* 1976, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267. The sole limitation restraining a trial court in its determination that a retrial is "manifestly necessary" requires that such a decision is committed to the trial judge's "sound discretion." *U. S. v. Jorn,* supra, 400 U.S. at 481, 91 S.Ct. 547; *U. S. v. Perez,* supra, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165; *Gori v. United States,* 1961, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901. In the situation at bar, by asserting that no "manifest necessity" appears of record to justify the mistrial granted, defendant has indirectly alleged an abuse of this discretion by the trial judge. We can perceive no such abuse. The transcript of the colloquy between the trial judge and jury foreman in defendant's initial trial—included as a part of the record herein on appeal—undeniably indicates the foreman's

conviction that the jury was deadlocked,[4] a circumstance which is almost universally recognized as supplying the "manifest necessity" required for a subsequent trial.

It is said in *Arizona v. Washington*, 1978, 434 U.S. 497, 98 S.Ct. 824, 832, 54 L.Ed.2d 717, just decided:

"At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial. The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws."

The matter is well summed up in *Arnold v. McCarthy*, 9th Cir. 1978, 566 F.2d 1377, 1386:

"In spite of the Supreme Court's efforts to eschew any rigid or mechanical rules, it has become well-established law that the paradigm example of 'manifest necessity' sufficient to permit a second trial of a defendant in a criminal case occurs when the jury cannot reach a verdict. *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *Keerl v. Montana*, 213 U.S. 135, 29 S.Ct. 469, 53 L.Ed. 734 (1909); *Dreyer v. Illinois*, 187 U.S. 71, 85–86, 23 S.Ct. 28, 47 L.Ed. 79 (1902); *United States v. See*, 505 F.2d 845 (9 Cir. 1974), cert. denied, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1974); *Forsberg v. United States*, 351 F.2d 242 (9 Cir. 1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966). * * * "

In accord is *Hovey v. Sheffner*, 1908, 16 Wyo. 254, 93 P. 305. In light of the factual situation, we cannot find that the trial judge's decision constituted in any manner an abuse of discretion. The "manifest necessity" for declaration of a mistrial was obviously present. To hold otherwise would point up the dangers recognized in *Arizona v. Washington*, supra, 434 U.S. at 509, 98 S.Ct. at 832:

" * * * If retrial of the defendant were barred whenever an appellate court views the 'necessity' for a mistrial differently than the trial judge, there would be

---

4. The transcript of trial shows:

"*State v. Peterson*, Cr. 14–41, 1:40 o'clock a. m., August 27, 1976, before Hon. J. F. Mahoney, District Judge.

 * * * * * *

"THE COURT: Please come to order and be seated. Ladies and Gentlemen, the word has reached us that you are hopelessly deadlocked. Is that correct?

"FOREMAN WILLIAMS: That is correct.

"THE COURT: Do you think there would be any advantage in going back and re-considering?

"FOREMAN WILLIAMS: We have discussed this for ten hours, Your Honor, and it is the same people that are holding the same way throughout the whole deliberations. There has been no change in the balloting whatsoever.

"THE COURT: For ten hours?

"FOREMAN WILLIAMS: About eight hours, sir.

"THE COURT: Are you satisfied, Mr. Williams, that no verdict can be reached?

"FOREMAN WILLIAMS: We have argued this every way that we know and both sides have argued themselves out at the end of deliberations we were just sitting there with no idea of which way to go, and therefore we notified you of our decision.

"THE COURT: I am satisfied, Gentlemen, that they are in fact deadlocked and there would be no purpose in sending them back for further deliberations.

"Mrs. Marsh, I will ask you to sit out of the jury box and sit over there. This is a ritualistic thing.

"There now being only eleven jurors, I declare a mistrial. You are discharged. I thank you for your work and I don't know who the dissenting jurors are and I don't care, but I respect your views. If you are unable to agree, you are entitled to be freed.

"Mrs. Hunter advises me that you need not appear next Monday with the other jurors because of your long and faithful service on this jury. She will call you when you are needed again.

"You are now free to go. Thank you very much.

"(The proceedings were then concluded at 1:43 o'clock a. m., August 27, 1976)."

a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court." (Footnotes omitted.)

■ Defendant argues forcefully that because of an alleged failure by the trial court to comply strictly with the requirements of § 7–11–211, W.S.1977,[5] his retrial was in violation of the constitutional guarantees against double jeopardy. In response, in addition to other points raised, the State urges that defendant's argument having not been presented to the trial judge for his consideration, it should not be considered by this court on appeal. While we must agree that the defendant did not specifically cite the statute in question to the trial judge either by way of argument or brief in support of his former jeopardy motion, we do not feel that such situation precludes us from considering the statutory assertion on appeal. We consider it a part of the double jeopardy issue before us. The trial judge did not in fact order an entry of reasons for discharge be made in the journal.

The defendant is contending, under the auspices of § 7–11–211, W.S.1977, that a trial court must, by order, cause to be placed into the journal of the court the reasons for a jury's discharge in order to preserve the right of the State to proceed against the same defendant for the same charge a second time; and that when such a procedure is not followed, any discharge would be with prejudice to further prosecution. Such a statutory provision appears unique to Wyoming. While we in no manner intend to denigrate any of its requirements, we believe that its substance, if not its technical form as well, has been fulfilled notwithstanding the fact that the trial judge in discharging the jury did not specifically enter a distinct, separate order reciting the reasons for discharge. As the transcript of the colloquy between the trial judge and jury foreman indicates, footnote 4, the jury had reached a state of impasse, and it was upon that basis that the trial judge discharged them. That record entry we hold to be substantial fulfillment of the statutory requirements. Nothing could be more convincing than the actual exchange between the trial judge and the jury. Requiring anything more would unquestionably exalt a lack of technical precision to the level of constitutional error, something we shall not do. Other courts have expressed a similar philosophy:

" * * * We agree to the proposition that there should have been a judicial ascertainment of the facts justifying the discharge of the jury, and that this should have been evidenced by a proper entry in the court's minutes. This should have been done in the interest of orderly judicial procedure if for no other reason. *But courts operate through human agencies, and oversights and mistakes occur in them as well as in all other departments of government or private enterprises. We would observe here that the entry of the judgment in the minutes of the court is only the evidence of the judicial ascertainment, and not the judicial ascertainment itself.* The trial judge doubtless determined the propriety of the jury's discharge, but failed at the time to carry forward in the minutes the judgment evidencing that fact. * * * *"
*Rodgers v. State*, 1922, 93 Tex.Cr.R. 1, 245 S.W. 697, 699. (Emphasis added.)

Then in *People v. Harding*, 1884, 53 Mich. 481, 19 N.W. 155, 157:

" * * * It is conceded on behalf of respondent that when it is found impossible for the jury to agree the judge may lawfully discharge them for that reason, and the discharge is not an acquittal; but it is contended that the records must show that the judge found that a necessity for the discharge existed; and upon the validity of this contention the case must turn. There is no doubt the report of the jury, that they cannot agree, is the

---

**5.** See footnote 2, supra.

proper evidence upon which the judge should act in determining upon the impossibility of their reaching a verdict. * * * And if in this case he had directed an entry upon the journal of the court that, being satisfied the jury could not agree, he directed their discharge, no question could be made of the right to proceed to a new trial. But, while it would be very proper to make such an entry, it has never been the practice in this state to do so. The fact that the judge, on receiving the report of the jury of their inability to agree, directs their discharge, is understood to be an assent on his part to their own conclusion, and a determination by him that the necessity for their discharge without a verdict has arisen. And we think this a proper view to take of his action. Any other would be technical, and tend in many cases to defeat justice."

See as well, *Arizona v. Washington*, 1978, 434 U.S. 497, 98 S.Ct. 824, 836, 54 L.Ed.2d 717, holding that a specific finding of "manifest necessity" is not critical and the question can be adequately considered when disclosed by the record. The requirements of the statute have been fulfilled.

■ Finally, before departing from the double jeopardy issue, we must dispose of a point raised by the State. The State argues that the denial of defendant's double jeopardy dismissal motion was an appealable "final order," and the appropriate appeal period has long since run [6] and defendant should be prevented from now questioning that denial through this appeal. We, as should be obvious from our previous extended discussion of the double jeopardy issue, do not agree that defendant is precluded.

This court has held that the defense of double jeopardy should be raised by motion before trial pursuant to Rule 16, W.R.Cr.P., otherwise it is waived. *Hutchins v. State*, Wyo.1971, 483 P.2d 519. The defendant did not file such a motion until March 28, 1977, and it was argued on the date set for trial about two weeks later, when the witnesses were all assembled and the jury panel had reported for duty. The defendant did not request a continuance in order to attempt an interlocutory appeal from the court's denial of the motion. We need not discuss the terrible inconvenience and disruption that would have been created to suspend at that point and appeal the sole question of double jeopardy.

This court has consistently resisted the allowance of piecemeal appeals under Rule 72(a), W.R.C.P.[7] *Knudson v. Hilzer*, Wyo. 1976, 551 P.2d 680; *Reeves v. Harris*, Wyo. 1963, 380 P.2d 769. The civil rules of procedure are applicable to appeals in criminal cases. Rule 38, W.R.Cr.P.

We have great difficulty trying to determine what language of Rule 72(a) would be applicable. While the State cites cases from other jurisdictions which allow such appeals, we are convinced that they have different procedural rules. The language of Rule 72(a) would be a trap for the unwary if we should construe it to require an appeal from an order of the trial court denying a motion of a defendant setting up a defense of double jeopardy in the absence of which it could not be considered on appeal.

We carefully avoid making any determination of what we might do if an interlocutory appeal on the sole issue of double jeopardy is actually attempted, to avoid going

---

**6.** At the time of denial of defendant's motion, 30 days was the applicable time period for filing a notice of appeal. Rule 73(a), W.R.C.P., now repealed by Rule 2.01, W.R.A.P., provides only 20 days.

**7.** Rule 72(a), W.R.C.P., now Rule 1.05, W.R. A.P.:

"A final order is: (1) an order affecting a substantial right in an action, when such order in effect determines the action and pre-

vents a judgment; (2) an order affecting a substantial right, made in a special proceeding, or upon a summary application in an action, after judgment; (3) an order, including a conditional order, granting a new trial on the grounds stated in Rule 59(a)(4) and (5) W.R.C.P.; if an appeal is taken from such an order, the judgment shall remain final and in effect for the purposes of appeal by another party."

into a second trial. There is respectable authority to the effect that the question is an exception to the rule of judicial finality, *Abney v. United States*, 1977, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651, deciding that there are simply no further steps that can be taken to avoid the trial barred by Fifth Amendment's guarantee, and therefore the threshold requirement of a fully consummated decision is satisfied. The court in *Abney* further reasoned that a double jeopardy challenge must be reviewable for full enjoyment of the double jeopardy clause before exposure to a second trial occurs. We hold that the defendant has not waived his right to question the denial of double jeopardy claim.

### DIMINISHED CAPACITY

Defendant's second issue, relating to diminished mental capacity, is a subject which has not been addressed by this court. In essence, defendant's claim is that because of his *involuntary* intake of a narcotic toxic substance—the Freon-II propellant contained in the chemical spray "Halt"— that substance alone or in combination with the alcohol he had previously consumed, reduced or diminished his mental capacity to a point that he was incapable of conscious thought or reason, as well as of forming criminal intent. This theory of defense, urges the defendant, was neither fully recognized nor properly instructed on by the trial court, and thus he was prejudiced. From what our research has developed, we are unable to agree. Defendant's argument confuses the concepts, as we understand them, of diminished capacity and intoxication, sufficient to negative a required criminal intent.

While admittedly a difficult hypothesis to define, as a majority of courts dealing with the subject have generally found, diminished capacity

"* * * includes any psychiatrically recognized abnormal mental condition, *other than intoxication produced by the use of alcohol or drugs*, including subnormal intelligence, but which does not constitute legal insanity under any definition of legal insanity." (Emphasis added.)

Anno., Mental or Emotional Condition as Diminishing Responsibility for Crime, 22 A.L.R.3d 1228, 1231. Such a concept recognizes not only that a mental disease or defect not arising to the level of legal insanity may be sufficient to negate the existence of a specific crime element, *People v. Welborn*, 1967, 257 Cal.App.2d 513, 65 Cal.Rptr. 8,[8] it as well exposes the illogic of the "all or nothing" assumption underlying numerous judicial decisions—that a person is either wholly "sane" and therefore fully answerable for all his actions, or "insane" and not answerable at all. *Commonwealth v. Walzack*, 1976, 468 Pa. 210, 360 A.2d 914, 918. While many courts have discussed both diminished capacity and intoxication in the context of negation of a required element of criminal intent (including malice as is in question in the situation at bar) most courts, in discussing diminished capacity recognize it independent and separate from any defense of intoxication. *People v. Poddar*, 1974, 10 Cal.3d 750, 111 Cal.Rptr. 910, 518 P.2d 342; *State v. Santiago*, 1973, 55 Haw. 162, 516 P.2d 1256; *State v. Green*, 1975, 271 Or. 153, 531 P.2d 245; *In re Miller*, 1973, 33 Cal.App.3d 1005, 109 Cal.Rptr. 648; *Johnson v. State*, 1970, 226 Ga. 511, 175 S.E.2d 840; *State v. Nichols*, 1965, 3 Ohio App.2d 182, 209 N.E.2d 750. See generally, Anno., §§ 5–9, 22 A.L.R.3d 1228, 1238–1257. Contra: *Johnson v. State*, Alaska 1973, 511 P.2d 118.

What we have here then is not really a situation of diminished capacity or psychiatric abnormality negating intent, but

---

**8.** See also, *People v. Drew*, Cal. (1978), 149 Cal.Rptr. 275, 583 P.2d 1318, which may discard the diminished capacity concept in favor of the test proposed by the American Law Institute, which provides as follows:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." (Model Pen.Code (Proposed Official Draft (1962) § 4.01, subpart (1).)

rather an incident in which voluntary intoxication is allegedly aggravated involuntarily by the introduction of chemical substances to the point that the defendant was arguably incapable of forming any homicidal or malicious intent. When the evidence and testimony is considered with those thoughts in mind, the instructions given by the trial court were more than sufficient to inform the jury of the defense theory being presented. In particular, we would note Instruction 23 which states specifically that the defense of involuntary intoxication may be available if the existing voluntary intoxication was involuntarily aggravated or increased to such a level as would render the defendant incapable of exercising independent judgment or volition.[9] In addition, by the terms of preceding Instruction 22, the jury was informed that even if defendant's intoxicated condition was totally voluntary, he could still be found incapable of forming an intent to kill with either premeditation or malice.[10] Against a background of these two instructions in particular, as well as the general ones concerning heat of passion and intent[11] which became the law of the case, we see no prejudice nor error. The law surrounding the defense theory of an al-

9. Instruction No. 23:

"You are instructed that intoxication is involuntary when it is produced in a person without his willing and knowing use of intoxicating drugs or substances and without his willing assumption of the risk of possible intoxication.

"Involuntary intoxication is not available as a defense to a person who knowingly and willingly consumed intoxicating liquor to a point of intoxication. *However, that defense may be available if you find that the degree of intoxication voluntarily created was increased or aggravated by other central nervous system depressants induced without the defendant's consent, where the increased total intoxication rendered the defendant incapable of exercising independent judgment or volition.*" (Emphasis added.)

10. Instruction No. 22:

"You are instructed that drunkenness is not a defense or an excuse for any crime. A man who voluntarily puts himself in a condition to have no control of his actions is held to be accountable for his acts as if he had been possessed of sound reason and discretion.

"However, our laws provide that when the crime rests in intention, the inebriated condition of the person at the time of the commission of the crime may be proven as bearing upon the question of intention. Murder in the first degree charged in the information and the included offense of murder in the second degree which you may consider as instructed, include the necessary element of intent to purposely and maliciously kill a human being. The element of intent is also present in the requirement of first degree murder that the crime be premeditated.

"*If the jury believes from the evidence that the defendant did the shooting at a time when he was so intoxicated from alcohol as to render him incapable of forming an intent to kill and of being incapable of premeditation, you should find the defendant not guilty of murder in the first degree or murder in the*

*second degree.* Intoxication is one of the circumstances to be considered in determining whether premeditation or intent to kill was present or absent.

"Drunkenness at the time of committing the offense is not a defense or excuse for the crime of manslaughter." (Emphasis added.)

11. Instructions No. 12 and No. 17 concerning heat of passion and intent:

Instruction No. 12:

"The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable man faced with the same situation. The basic inquiry is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."

Instruction No. 17:

"The Court instructs the jury that as to the matter of intent we have no power to ascertain the certain condition of a man's mind. The best we can do is to infer it more or less satisfactorily from his acts and surrounding circumstances.

"The intent with which an act is done is an act or emotion of the mind seldom if ever capable of direct and positive proof, and it is to be arrived at by such just and reasonable deductions or inferences from the acts and facts proved as the guarded judgment of a candid and cautious man would ordinarily draw therefrom."

leged incapability to form any malicious or homicidal intent was presented to the jury.

## EXCLUSION OF EVIDENCE

By the third of his five issues, defendant contends that the trial court committed reversible error when it refused to allow his presentation to the jury of what he considers two key elements of evidence: 1. the videotape film of a "drunk challenge" [12] experiment undergone by him in which his blood alcohol level at the time of the shooting was recreated; 2. the testimony of two witnesses concerning their contact with the deceased previous to the situation at bar wherein they were both allegedly sprayed with the chemical "Halt". In denying admission of these elements of defendant's evidence, the trial court questioned the relevancy as well as remoteness of both offerings, and with particular reference to the videotape, at least impliedly found it to be cumulative and presenting problems of convenience.

 Although as a general proposition videotape film is held to be admissible—foundational requirements being fulfilled—the admissibility still rests within a trial court's sound discretion, Anno., Criminal Prosecution-Videotape Film, 60 A.L. R.3d 333, a factor of which, as with more traditional photographic evidence, is expenditure of time and convenience, McCormick, Evidence, 2d ed., pp. 533–534:

> "Judicial discretion in the admission or exclusion of motion pictures is constantly emphasized in the decisions, and is perhaps largely attributable to the fact that the presentation of this kind of evidence will involve considerable expenditure of time and inconvenience. * * *" (Footnote omitted.)

In addition, as with many other questions which commonly arise at trial, proper disposition of which is difficult if not impossible from simply the printed record on appeal, questions concerning the cumulative nature as well as relevancy and remoteness of evidence are left to the sound discretion of the trial court, subject to challenge and disturbance only for clear abuse. This court spoke to that problem in *Daellenbach v. State,* Wyo.1977, 562 P.2d 679, 682:

> " * * * The materiality or relevance, cumulative nature of proffered evidence, as well as its admission, reside within the sound discretion of the trial court. Absent a clear showing of abuse of this discretion, the trial court's decision will not be disturbed. * * *"

 Two witnesses were called by defendant to testify as to their being sprayed by the deceased victim with a substance perhaps similar to that sprayed on the defendant. The offer was that they had been sprayed five years previously with a material also containing capsicum. The trial judge considered the evidence remote, prejudicial as trying the victim for similar incidents, of little probative value and because expert testimony was available and would be produced to show the painful effect on the body.

It seems clear from the colloquy over the exclusion that the real reason for the trial judge's exclusion was its prejudicial effect rather than its remoteness and tendency to distract from the real issue in point of time, in the sense discussed by McCormick on Evidence, 2nd ed. HB, pp. 438–439, in pertinent part:

**12.** The experiment consisted of the defendant, according to his recollection, drinking the same quantities of alcohol over about the period in question in front of a videotape camera to record his reactions. The expert testimony was that they "simply had him consume 3 ounces an hour for eight hours." The testing took place several months after the murder in an environment and surroundings entirely unlike those of the defendant's on the day of the crime, without the movement from place to place and lacking the atmosphere and associa-tions of a public drinking establishment. Defendant's mental state following his participation in a homicide would be unlike that before he would have caused the death of another. Nor was there a recreation of emotional events associated with the episode involved over bar charges, the squirting into his face of "Halt", or the mental state developed to cause him to go after a firearm. These are the characteristics of remoteness which would justify approval of the trial judge's exclusion of the evidence.

"Relevant evidence, then, is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible. But relevance is not always enough. There may remain the question, is its value worth what it costs? There are several counter-balancing factors which may move the court to exclude relevant evidence if they outweigh its probative value. In order of their importance, they are these. First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy. Second, the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues. * * * " (Footnotes omitted.)

That prevailing view is consistent with Rule 403, W.R.E.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

(Rule 403 was not in effect at the time of the trial of this case.)

There was no prejudice to the defendant created by exclusion of the offered testimony. The defendant represented to the court that the sole purpose of the testimony was to demonstrate the pain and effect on the human body caused by being sprayed with a substance similar to that dispersed in the defendant's face. The trial judge was aware at that time that defendant had available an expert witness who would testify as to the effects on the human body. That witness was in fact produced by the defendant. He was a respected, well qualified forensic scientist. He testified as to the content of Halt. By way of experiment in his laboratory in preparation for his participation in the trial, he shot some of the material into the air and let it fall on his face:

"I had an excrutiating pain. It was like somebody stuck a couple of hot pokers into my eyes. And I don't remember exactly what happened after that. I had read the can and it says someplace on there to use water if you get any in the eyes, and I put cold water in my eyes, but that didn't seem to help either. This very great burning sensation just seemed to set my head on fire just like I had fallen into a volcano, and it wasn't for some time after that that I sort of came to enough to set the thing down and get rid of it, and I don't know what happened to it in the meantime. I didn't shoot it but once and that was enough." (Tr. pp. 881–882.)

The excluded testimony would in any event only have been cumulative. There is therefore no basis to reverse on the ground of improper exclusion of evidence.

### FAIR TRIAL

Within this fourth issue on appeal, defendant's argument that he did not receive a fair trial is somewhat general and to some extent repetitive in areas previously covered, his main new allegation being that because of the State's alleged "misconduct" in failing to call certain witnesses the defense felt were relevant and important, the defendant was denied a fair and impartial trial. As a general proposition, " * * * [a] fair trial, as we understand the expression, means simply a trial that is just; a trial in which the accused is given the benefit of all the safeguards provided by the Constitution and laws and one in which even-handed justice is dispensed. * * * " *State v. Jones*, 1967, 251 La. 431, 204 So.2d 775, 778–779. However,

" * * * [t]he Constitution does not * * * guarantee every defendant a perfect trial. The rights vouchsafed are practical, reasonable rights rather than ideal concepts of communication, and even these pragmatic rights may not be exercised without limit. * * * "

*Ferrell v. Estelle*, 5th Cir. 1978, 568 F.2d 1128, 1131. See also, *State v. Colbert*, 1977, 17 Wash.App. 658, 564 P.2d 1182, 1187; *State v. Guffey*, 1970, 205 Kan. 9, 468 P.2d 254, 268; *Opie v. Meacham*, D.Wyo.1968,

293 F.Supp. 647, aff'd. 419 F.2d 465, cert. denied 399 U.S. 927. In addition, any alleged misconduct on the part of the prosecution herein would not constitute reversible error unless it were shown to have resulted in substantial prejudice to the accused, *People v. White*, 1977, 52 Ill.App.3d 517, 367 N.E.2d 727, 731; *Hays v. State*, Wyo.1974, 522 P.2d 1004, a situation which defendant has not fulfilled his burden of proving. In each of the specific instances questioned, the anticipation of defenses, limitation of cross-examination, failure by the State to call specified witnesses, and failure by the State to introduce defendant's blood test results, the defendant has not with sufficient particularity delineated how or why he was substantially prejudiced, but rather has made some broad general assertions concerning alleged due process violations and adverse presumptions to be drawn from the failure of a party to call an available witness. Such alleged problems appear more illusory than real; we can perceive no error.

## SENTENCING

In concluding, we deal with defendant's final assertion: that contrary to the opposite conclusion which he ultimately reached, the trial judge did have the authority under the provisions of § 7–13–301, W.S.1977 [13] to impose a sentence upon defendant other than the minimum term of years specified by the second-degree murder statute.[14] In response, the State has alleged that although the trial judge may well have viewed the defendant as deserving of leniency and mercy, he was totally correct in his conclusion that neither probation nor any other sentencing alternative was available in the situation at bar, citing in support thereof, § 7–13–203, W.S.1977.[15] The State urges that since under this provision parole before sentence is precluded when any *murder* is involved, consistent legislative intent requires a finding that alternative sentencing under § 7–13–301 is also prohibited in convictions for second-degree murder, urging in particular that the phrase of § 7–13–301 "except crimes punishable by death or life imprisonment" indicates clearly such an intent. To such an interpretation we are unable to assent. Under the provisions of § 7–13–203, a defendant is allowed a considerable degree of liberty, his actions and freedom being subject to what are overall rather minimal limitations with the possibility of no sentence at all. It would thus be reasonable to expect the legislature to preclude from the benefit of such alternative defendants convicted of more serious crimes such as those specified, i. e. murder, sexual assault, arson. On the other hand, § 7–13–301 is by clear implication much more restrictive since it does not itself specify the conditions of any probationary freedom.[16] Because of and in reliance on this apparently more restrictive freedom, the legislature could have, and we believe in fact did reasonably conclude that those criminal defendants excluded from the benefits of § 7–13–203 could be in some cases beneficially rehabilitated under the provisions of § 7–13–301 with one exception—those guilty of "crimes punishable by death or life imprisonment." Defendant's contention thus comes down in its simplest

---

13. Section 7–13–301, W.S.1977:

 "After conviction or plea of guilty for any offense, except crimes punishable by death or life imprisonment, the court may suspend the imposition of sentence, or may suspend the execution of all or a part of a sentence and may also place the defendant on probation or may impose a fine applicable to the offense and also place the defendant on probation. With the consent of a defendant charged with a crime, except a crime punishable by death or life imprisonment, the court may suspend trial and place such defendant on probation."

14. See § 6–4–104, W.S.1977, Footnote 1, supra.

15. Section 7–13–203, W.S.1977, dealing with parole *before* sentence:

 "If any person is found guilty of or pleads guilty to any felony except murder, sexual assault in the first or second degree or arson of a dwelling house or other human habitation in the actual occupancy of a human being, the court shall ascertain * * * *"

16. In all likelihood, a defendant sentenced under § 7–13–301 would be subject to the limitations and requirements of the general probation and parole statutes, §§ 7–13–401 et seq., W.S. 1977.

form to a determination of what crimes are anticipated by that phrase; and while authority thereon is sparse, the courts which have discussed the question have concluded as the defendant herein has urged: that the phrase does not include offenses which have as a minimum sentence a term less than life and as a maximum life imprisonment. In concluding that the phrase in question as found in the Colorado Juvenile Code [17] did not preclude juvenile court jurisdiction over a defendant charged with aggravated robbery, the Colorado Supreme Court stated, *Jaramillo v. District Court*, 1971, 173 Colo. 459, 480 P.2d 841, 842–843:

> "There are three possible interpretations of 'punishable by death or life imprisonment.' (1) It may mean only those offenses having as alternative punishments life imprisonment or death, which in this state, so far as comes to mind, would embrace only first degree murder and kidnapping in which injuries result. * * (2) Those crimes which are punishable only by life imprisonment and those offenses punishable only by death, an example of which is the Habitual Criminal Act * * *. (3) Those crimes which have a minimum sentence of less than life imprisonment and a maximum of either life imprisonment or death. In Colorado this latter category would embrace aggravated robbery, first degree rape, *second degree murder*, kidnapping and all crimes embraced within the Sex Offenders Act. * * * [W]e hold that the meaning of 'punishable by death or life imprisonment' involves either category (1) or (2) mentioned above, and it is not necessary for us to determine which. In other words 'punishable by death or life imprisonment' does not embrace offenses which have a sentence of less than life imprisonment as a minimum and a maximum of either life imprisonment or death."

17. 1969 Perm.Supp. C.R.S.1963, 22–1–4(4)(b): "A child shall be charged with the commission of a felony only as provided in subsection (4)(a) of this section, except for crimes of violence *punishable by death or life imprisonment* where the accused is fourteen years

See as well, *People v. Herrera*, 1973, 182 Colo. 302, 512 P.2d 1160; *Maddox v. People*, 1972, 178 Colo. 366, 497 P.2d 1263; *Garrett v. State*, Mo.1972, 481 S.W.2d 225; *Parrish v. State*, 1943, 153 Fla. 105, 14 So.2d 171. With such a conclusion we are inclined to agree, particularly when considered in light of the broad purposes underlying the concept of probation, education, rehabilitation, and perhaps most important, the individualizing of justice in a sometimes rigid system of criminal law. *State ex rel. Hauser v. Carballo*, 1978, 82 Wis.2d 51, 261 N.W.2d 133; *Holland v. Fla. Real Estate Comm.*, Fla.Dist.Ct.App.1977, 352 So.2d 914; *Gillespie v. State*, 1977, 17 Wash.App. 363, 563 P.2d 1272; *State v. Baca*, 1977, 90 N.M.App. 280, 562 P.2d 841; *People v. Edwards*, 1976, 18 Cal.App.3d 796, 557 P.2d 995, 135 Cal. Rptr. 411. We hold the trial judge was mistaken in reading too narrowly the permissible alternatives under the statute in question. If the legislature desires any different result, it should amend § 7–13–301.

Affirmed, except remanded for reconsideration of sentence.

of age or older. * * * " (Emphasis added.)
Since 1971 the wording of the statute has been changed as well as its designation, see C.R.S. 1973, 19–1–104(4)(b).