# STATE OF OREGON,
*Respondent,*

*v.*

# STEVEN RAY LaSTAIR,
*Appellant.*

(10-84-05078; CA A36534)

726 P2d 1193

John P. Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Terry Ann Leggert, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were

Dave Frohnmayer, Attorney General and James E. Mountain, Jr., Solicitor General, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

WARDEN, P. J.

Young, J., specially concurring.

Van Hoomissen, J., dissenting.

## WARDEN, P. J.

In this criminal case, defendant appeals his convictions for rape in the first degree and sexual abuse in the second degree. He argues that the trial court erred in admitting evidence of a polygraph examination for impeachment purposes, because he had not stipulated to its admission. We reverse.

Defendant was convicted of the sexual abuse and rape of his adopted daughter, Rekha. At the Lane County Courthouse, defendant submitted to a polygraph examination, arranged by Officer Dixson and administered by Officer Fox. After Fox accused him of lying during the test, defendant made several admissions to Dixson. On direct examination, defendant testified regarding his statements:

"After a discussion with Mr. Fox[,] I went to that interview with the intent in mind of sharing with them some information about my involvement with my daughter Rekha, * * * I did feel as though there were grounds for her allegations, but not to [the] extent that she was making them. By no means. I had stressed that to Mr. Dixson and to Mr. Fox. That's when Mr. Fox went out to get Mr. Dixson."

On cross-examination, defendant testified:

"Q. You indicated that you initially came down on June first to level with the police about what had happened[,] is that true?

"A. The police weren't the only people I told, but yes, they did not wear me down.

"Q. Excuse me?

"Q. They had made the indication that they had wore down my front.

"Q. I don't think they said that.

"A. Yes, sir they did. I heard 'em right here in the court.

"Q. That's for the jury to decide.

"A. Okay.

"Q. One of the questions that Detective Fox asked you was: Have you ever done anything sexual with Rekha?

"A. Excuse me, I'm sorry I was changing position.

"Q. Isn't one of the questions that Detective Fox asked you,

quote, have you ever done anything sexual with Rekha, end quote?

"A.   In what interview?

"Q.   In the interview on June first, nineteen eighty-four, here in the courthouse when you and he were here alone?

"A.   Shortly after he came in, yes. I had intention of telling him about that anyway.

"Q.   Didn't you tell him, no, you had never, never done anything sexual with Rekha?

"A.   Not at the interview, the previous interview, yes, but not that interview.

"Q.   Detective Dennis Fox, the first?

"A.   Excuse me, I'm sorry, I thought you said Dixson. Dennis Fox? I came here to talk with Detective Dixson. I did not really want to speak with Detective Fox.

"It was interesting the way the two worked together on that situation. But, yes, I denied it initially with Mr. Fox.

"[Prosecutor]: I have a matter for the Court."

■     Unless stipulated to by the parties, evidence of a polygraph examination is generally not admissible in Oregon. *State v. Brown,* 297 Or 404, 687 P2d 751 (1984).[1] The state admits that the polygraph evidence was not admissible in its case-in-chief but argues that defendant's testimony "opened the door" to the evidence, because

"[t]he evidence that defendant came to the courthouse to take a polygraph test was inconsistent with defendant's self-serving portrayal that he came to the courthouse solely to be candid with the police [and] was inconsistent with defendant's obviously-intended implication that detectives Fox and Dixson had 'worked together' in some diabolical manner."

We need not reach the question of whether polygraph evidence is admissible for impeachment purposes, because, even assuming that it is, the evidence does not support the trial court's finding that defendant "opened the door."[2]

---

[1] The court in *Brown* stated that it has not yet passed on the question of the admissibility of polygraph evidence pursuant to a stipulation. 297 Or at 445 n 35. We have since held that the evidence is admissible. *State v. Bass,* 76 Or App 396, 708 P2d 1207 (1985).

■ We disagree with the state's characterization of defendant's testimony. He did not testify that he came to the courthouse solely to be candid with the police. He stated, *"After a discussion with Mr. Fox*[,] I went to that interview with the intent in mind of sharing with them some information * * *." (Emphasis supplied.) Defendant could not have been referring to his reason for coming to the courthouse, because he was already at the courthouse when he talked to Fox. The interview he referred to was presumably the interview after the polygraph examination, in which he made admissions to Dixson. Because defendant made no statement concerning his intentions in coming to the courthouse, the state could not rebut his testimony by showing that he came to take a polygraph examination. Neither did the state elicit on cross-examination a statement from defendant that he came to the courthouse solely to be candid with the police.[3] We have reviewed the record, and none of the statements defendant made about his intentions on June 1, 1984, was sufficient to "open the door."[4]

The state next tries to justify its reference to the

---

[2] The dissent cites several cases for the proposition that evidence, although inadmissible during the state's case-in-chief, may be admissible for impeachment purposes. 81 Or App at 567 n 1. None of the cited cases from Oregon or the United States Supreme Court deals with polygraph evidence. We emphasize that the question of whether polygraph evidence is admissible for *impeachment purposes* has not been decided in Oregon.

[3] On cross-examination, the following exchange occurred:

"Q. You indicated that you initially came down on June first to level with the police about what happened[,] is that true?

"A. The police weren't the only people I told, but yes, they did not wear me down.

"Q. Excuse me?"

Defendant's answer was not responsive to the question. He apparently thought that the prosecutor was inquiring into the voluntariness of his statements to the police. The exchange did not "open the door" for admission of the polygraph evidence.

[4] Even if the state's interpretation of defendant's testimony is accepted, it does not justify reference to the polygraph examination. Defendant could be impeached without it. To demonstrate that defendant did not intend to be truthful with the police, the state needed only to inquire about the responses defendant gave Fox: that he first denied involvement with his daughter and then, when confronted by Fox, that he changed his story and made some admissions. That could have been elicited without informing the jury that it was in the context of a polygraph examination.

polygraph examination by defendant's statement on cross-examination:

"I came here to talk with Detective Dixson. I did not really want to speak with Detective Fox. It was interesting the way the two worked together on that situation."

The state argues that, because defendant "obviously" intended to imply that Fox and Dixson had worked together "in some diabolical manner," the polygraph evidence was proper rebuttal. We disagree. It is not clear what defendant meant by the statement, much less that he meant to imply that the conduct of the detective was improper. Defendant testified later, "I didn't come here to talk to Mr. Fox, no. It was Mr. Dixson that made the arrangements for me to come down here." Defendant's statement did not "open the door" to the highly prejudicial polygraph evidence.

The dissent states:

"[T]he state sought to impeach defendant by showing that he had testified inconsistently *about his reason for coming to the courthouse*—that, contrary to his self-serving testimony that he had come to the courthouse to tell the truth to the police, in fact, he had come there because he had been asked to take a polygraph examination." 81 Or App at 569. (Emphasis in original.)

The dissent concludes "that defendant's self-serving testimony opened the door to the admission of the disputed evidence for impeachment purposes." 81 Or App at 571. It points to no place in defendant's testimony where he had stated a reason for coming to the courthouse; after again reviewing the transcript, we find none, on either direct or cross-examination. The first such reference is in the first of the prosecutor's questions quoted above. If a door was opened, it was done by the prosecutor, not by defendant. The state is not entitled to get in evidence that defendant took a polygraph examination through a door opened by itself.

■ The state argues that there was no prejudice to defendant, because the test result was not disclosed to the jury. However, the prosecutor clearly signalled to the jury that defendant had failed the test. He argued in closing:

"Mr. LaStair says he came to the July first interview, the one where the polygraph was given, to admit that he had been engaging in sexual activity with Rekha. If that was the case[,]

why did he go through the charade of the polygraph and deny during the course of the polygraph, and only admit after he's confronted by Dennis Fox? How transparent?

"'* * * * *

"What happened in this case, I would submit to you, was that when this finally came out, Mr. LaStair denied and denied, denied to the police; denied to his wife; came down and tried to beat the polygraph. When confronted by Detective Fox with the fact that Detective Fox didn't believe [him] * * *."

The prosecutor continued in his rebuttal argument to the jury:

"[H]e tells you folks that he came down to the police department on June—or the courthouse, across the way here, on June first to admit some involvement with his daughter, when in reality he came down here trying to beat the polygraph. He lied and lied and lied. He finally got confronted and only then told his story * * *."

The clear implication of the prosecutor's statements to the jury is that the result of the polygraph examination was that defendant had failed it and that the examination had proved that he had been lying.

One reason given by the Supreme Court for excluding polygraph evidence is that the jury may overvalue it.

"Polygraph evidence may well divert the trier of fact from the direct and circumstantial evidence presented in a case to a distorted valuation of the polygraph evidence." *State v. Brown, supra,* 297 Or at 440.

We cannot say that the court's jury instructions were sufficient to cure the error or that the error in admitting the evidence was harmless and was very unlikely to have changed the result of the trial. Therefore, we reverse. *State v. Mains,* 295 Or 640, 663, 669 P2d 1112 (1983).

Reversed and remanded for a new trial.

**YOUNG, J.,** specially concurring.

The lead opinion reaches the right result for the wrong reason. I agree that evidence of polygraph results is not admissible unless stipulated to. *State v. Brown,* 297 Or 404, 687 P2d 751 (1984); *State v. Bass,* 76 Or App 396, 708 P2d 1207 (1985). I also believe that evidence of the fact that a polygraph

test was taken is not, as a general rule, admissible. In *State v. Brown, supra,* the court stated:

> "[W]e conclude that upon proper objection *polygraph evidence* shall not be admissible in any civil or criminal trial in this state or any other legal proceeding subject to the rules of evidence under our Oregon Evidence Code." (Emphasis supplied; footnote omitted.)

*See also State v. Snider,* 296 Or 168, 171, 674 P2d 585 (1983); *State v. Green,* 271 Or 153, 171, 531 P2d 245 (1975).[1]

I understand the phrase "polygraph evidence" to include polygraph results *and any other evidence relating to a polygraph.* In spite of the absoluteness of that language, I believe that polygraph evidence other than the polygraph results is admissible *if* a defendant opens the door to that evidence.

In *State v. Mills,* 76 Or App 301, 310, 710 P2d 148 (1985), *rev den* 300 Or 546 (1986), we held that an illegally obtained confession is admissible for impeachment purposes if the defendant takes the stand and makes that evidence pertinent to determining whether he is telling the truth. I see no reason to distinguish between an illegally obtained confession and polygraph evidence, both of which are highly prejudicial and both of which are inadmissible as a general rule. Therefore, I believe that polygraph evidence is admissible *to the extent that* it impeaches a statement defendant made under oath at trial.

I agree with the dissent to some extent. Defendant testified that he came to the courthouse to level with the police. Evidence that defendant came to the courthouse to take a polygraph examination may or may not impeach that testimony; it might therefore be admissible under the *Mills* rationale. Either way, defendant did not "open the door" to

---

[1] In *Snider,* the court held that evidence of a plea agreement containing a provision that the state's witness must take and pass a polygraph exam to verify trial testimony is inadmissible, because it improperly bolsters the witness' testimony. 296 Or at 172. In *Green,* the court held that the fact that the defendant took a polygraph before confessing is not admissible, because the jury is likely to infer that he confessed because he was caught lying by the polygraph. 271 Or at 169. Here, however, the mere fact that defendant took the polygraph neither bolsters defendant's testimony nor leads to an inference as to the result of the polygraph. I believe that *Brown* extends the holdings in *Green* and *Snider* to exclude any evidence that a polygraph was taken.

the *results* of the polygraph. Yet the state elicited testimony from which the jury could infer that defendant had lied on the polygraph:

"Q:  You came down here to take a polygraph test, didn't you?

"A:  That's correct.

"Q:  It was only after that polygraph test that you leveled with anybody, or admitted that any type of sexual activity had occurred?

"A:  It was only after the polygraph test that I had a chance to talk to Mr. Dixson, too.

"Q:  The first person you told from the police was Mr. Fox, wasn't it?

"A:  Yes, sir.

"Q:  It was only after the polygraph test that you told him that, wasn't it?

"A:  Yes, sir."

As was the case in *State v. Green, supra,* that testimony permits the jury to infer that defendant lied on the polygraph. (*See* n 1, *supra.*) In other words, the testimony impermissibly placed the results of the polygraph before the jury. Defendant is entitled to a new trial.

**VAN HOOMISSEN, J.,** dissenting.

I respectfully dissent.

Generally, evidence of an unstipulated polygraph examination is not admissible. *State v. Brown,* 297 Or 404, 687 P2d 751 (1984). However, evidence that is inadmissible during the state's case-in-chief may be admissible for impeachment purposes after a defendant has testified. *See United States v. Havens,* 446 US 620, 100 S Ct 1912, 64 L Ed 2d 559 (1980); *Oregon v. Hass,* 420 US 714, 95 S Ct 1215, 43 L Ed 2d 570 (1975); *Harris v. New York,* 401 US 222, 91 S Ct 643, 28 L Ed 2d 1 (1971); *State v. Mills,* 76 Or App 301, 710 P2d 148 (1985), *rev den* 300 Or 546 (1986); *State v. Hall,* 36 Or App 133, 583 P2d 587 (1978); *see also Commonwealth v. Vitello,* 376 Mass

426, 453-57, 381 NE2d 582 (1978)(polygraph evidence admissible to impeach defendant's testimony).[1]

During the state's case-in-chief, the state's witnesses did not mention that defendant had agreed to come to the courthouse to take a polygraph examination. The state's evidence showed that defendant was first questioned by Detective Dixson, the primary police investigator of the allegations of sexual misconduct made against defendant by his daughter. At that time, defendant denied any wrongdoing. A few days later, Dixson contacted defendant again. He asked him to come to the courthouse to take a polygraph examination. Defendant agreed to do so. He came to the courthouse voluntarily, where he was questioned by Detective Fox. Again, defendant denied any wrongdoing. After Fox told him that he did not believe him, defendant admitted sexual misconduct with his daughter.[2] He repeated that admission to Dixson.

---

[1]*State v. Brown, supra,* is distinguishable. In *Brown, the defendant* sought to introduce evidence regarding his submission to and truthful completion of polygraph examinations. In this case, the state did not seek to show the result of the polygraph examination or to introduce evidence of defendant's submission to the test on the issue of his veracity. The state only introduced evidence that defendant came to the courthouse *to take a polygraph examination* to impeach the clear implication of his testimony that he came there to tell the truth to the police. The majority opinion finds no place in defendant's testimony where he had stated a reason for coming to the courthouse. 81 Or App at 562. As noted below, 81 Or App at 570, (Van Hoomissen, J., dissenting), the trial court concluded otherwise.

The problems mentioned in *Brown,* the jury placing undue emphasis on the polygraph results, the delay caused by a battle of experts and the questions concerning the validity of the test due to the many variables that may affect the results, are not present in this case. Here, the results of the test were not in evidence. *See People v. Sammons,* 17 Ill 2d 316, 161 NE2d 322 (1959); *State v. Williams,* 279 NC 515, 184 SE2d 282 (1971). Further, the jurors were specifically instructed that results are not admissible and that they should not speculate as to the result. Neither are there problems related to OEC 608 and the rule against permitting witnesses to testify about another's character for truthfulness based on a specific instance of conduct. This case involves a defendant testifying, untruthfully, about his own conduct.

[2]Fox testified, in part:

"Q. Describe the interview for us if you would, please, sir?

"A. The interview consisted of talking to Mr. LaStair regarding the allegations that his adopted daughter had made, concerning the sexual activity between them.

"Initially, Mr. LaStair said that nothing sexual had ever taken place. So that we knew what we were talking about, when we said 'sexual activity' we discussed the various things that people can do that would constitute sexual activity.

"Mr. LaStair told me that none of those things happened, there was no sexual activity, that she was lying. I asked Mr. LaStair some questions, specifically

During the defense case-in-chief, defendant testified on cross-examination:

"Q.   You indicated that you initially came down on June first to level with the police about what had happened is that true?

"A.   The police weren't the only people I told, but yes, they did not wear me down.

"Q.   Excuse me?

"A.   They had made the indication that they had wore down my front.

"Q.   I don't think they said that.

"A.   Yes, sir they did. I heard 'em right here in the court.

"Q.   That's for the jury to decide.

"A.   Okay.

"Q.   One of the questions that Detective Fox asked you was: Have you ever done anything sexual with Rekha?

"A.   Excuse me, I'm sorry I was changing position.

"Q.   Isn't one of the questions that Detective Fox asked you, quote, have you ever done anything sexual with Rekha, end quote?

"A.   In what interview?

"Q.   In the interview on June first, nineteen eighty-four, here in the courthouse when you and he were here alone?

"A.   Shortly after he came in, yes. I had intention of telling him about that anyway.

"Q.   Didn't you tell him, no, you had never, never done anything sexual with Rekha?

"A.   Not at that interview, the previous interview, yes, but not that interview.

"Q.   Detective Dennis Fox, the first?

---

concerning the statement that he made, and after asking the questions, I told him that I didn't think that he was telling me the truth. I told him I didn't know, exactly and precisely what happened or why it happened, and felt that because I knew that he wasn't telling me the truth, in my opinion, other folks would also, and that he should straighten the matter up.

"At this point, Mr. LaStair told me that there had been sexual activity with Rekha late at night when the rest of the family was in bed. She had sat on his lap in her underwear, when he was in his underwear, that he touched her breast and vagina, and that when she was on his lap that he had ejaculated.

"I asked him to discuss this matter with the detective [Dixson] that I was assisting and [he] agreed to do so."

"A. Excuse me, I'm sorry, I thought you said Dixson. Dennis Fox? I came here to talk with Detective Dixson. I did not really want to speak with Detective Fox.

"It was interesting the way the two worked together on that situation. But, yes, I denied it initially with Mr. Fox."

At that point, the state sought to impeach defendant by showing that he had testified inconsistently *about his reason for coming to the courthouse*—that, contrary to his self-serving testimony that he had come to the courthouse to tell the truth to the police, in fact he had come there because he had been asked to take a polygraph examination.

The trial court clearly recognized that defendant was trying to mislead the jury. The following colloquy took place outside the presence of the jury.

"MR. ATKINSON [Prosecutor]: I don't know that the record at this point indicates that the defendant came to the courthouse on June first, nineteen eighty-four, to take a polygraph test, which was administered by Dennis Fox, and that was the purpose for him coming to the courthouse that day; that contrary to his claim that he came to the courthouse to level with the police.

"He came down and initially denied any sexual contact at all between himself and his daughter during his interview with Detective Fox.

"* * * * *

"MR. ATKINSON I would submit the door has been opened. We've been real meticulous in staying away from that. There was a couple times when I thought we were close. I stayed away from it.

"However, in light of this position being taken by the defendant, I submit the door has been opened. I can't go any further on cross-examination. I don't think I can continue without getting into it.

"MR. HILL [Defense Counsel]: Well obviously I will object to that, Your Honor, on the basis of *State v. Brown,* * * *.

"MR. ATKINSON: It's preposterous that this gentleman says he came down to level with the police, and during the pre-test polygraph interview he denies having any sexual activity at all with his daughter. He goes all the way through a polygraph test and denies having any sexual activity at all with his daughter.

"It's totally contrary to what he indicated to us. And I would submit that he's opened the door. Just like when the Court preliminarily rules in a motion to suppress, or a judge did, that a confession was obtained inadmissibly, or a search was conducted illegally; then the defendant takes the stand and opens the door in some way or another, that illegally obtained confession or physical evidence is admissible.

"I will acknowledge that in the normal case a polygraph test or the results of a polygraph test are not admissible. But when someone's credibility is at issue, to the extent that it is in this case, and takes the position that I would submit is preposterous, as the posturing he is doing here, that I ought to be able to prove it.

"* * * * *

"THE COURT: Well the testimony of the defendant has been that he came down to talk to Dixson, and he was not coming down to talk to Fox. That was the clear implication. He made the comment that it was interesting the way they worked together.

"He said he came down with the intent to tell the truth, and the circumstances of how, quote, the truth comes out then becomes very relevant. In no way is the result of any polygraph examination going to come into evidence, but who a person tells what to, and the circumstances they tell it in, is certainly relevant.

"If a person lies to a counseling priest that's relevant, as compared to a person lying to your lifetime adversary. A person fibbing to a child is different than a person fibbing under oath. A person not telling the truth in a courtroom setting is different than a person not telling the truth out of a courtroom setting.

"The clear import of the defendant's testimony is that it was not his — his intention was to come to tell the truth to Mr. Dixson, that Mr. Fox was working some interesting way with Mr. Dixson, and that his intention all along was to tell the truth when he came here, because he volunteered that he had told, apparently, the truth before he came here.

"I think it is highly probative, and the door has been opened to the fact that the sole purpose of the visit was to be subjected to being wired up to a polygraph, and that in the seriousness of the moment, which is not the correct phrase, but it's close to it, while being hooked up he makes a statement that he later retracts as not being the truth. That certainly gives a different import to his statement that, I was intending to tell the truth all along, to an import that when

confronted with what was the truth, he changed his story. I clearly think to do other —

"MR. HILL: I think it's error to —

"THE COURT: I'm not here to argue with you. I'm ruling. You made your comments.

"We have error or we don't have error. I don't think we do have error. It's much the same as the comment of the court that a defendant does not have the benefit of suppressing evidence that is either illegally obtained, or generally not admissible, and then using that ruling to give a different interpretation to the evidence.[3]

"The state, in its case in chief, stayed totally away from polygraph. And to exclude the seriousness of the moment, when even according to this witness's testimony, the truth was not told, gives us, certainly, a different implication to his testimony, even than I heard.

"The results of the polygraph are certainly not admissible. They are never admissible under any circumstances, as far as I can tell."

I agree with the trial court that defendant's self-serving testimony "opened the door" for impeachment purposes. The concurring opinion agrees with my conclusion in this regard. 81 Or App at 565.

There was no testimony or argument that defendant had failed a polygraph examination. The trial court specifically instructed the jury that it was not to speculate as to whether there was a polygraph *result* in the case or, if there was a *result,* what it was and, further, that evidence of the *result* of any polygraph examination was not admissible.[4] No

---

[3]In a different context, the United States Supreme Court has observed:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury * * *.

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris v. New York, supra,* 401 US at 225.

[4]The trial court instructed the jury:

"Ladies and gentlemen of the jury, before I discharge you for the evening I have an instruction for you. Please listen to me very carefully.

"You have heard about an interview in the setting of a planned polygraph examination. That setting is evidence, but I instruct you that evidence of the

exception was taken by defendant to the court's instructions. Thus, any error was cured by the trial court's instructions. *See People v. Babcock,* 223 Cal App 2d 813, 36 Cal Rptr 178 (1963); *People v. Parella,* 158 Cal App 2d 140, 322 P2d 83 (1958); *Austin v. State,* 262 Ind 529, 319 NE2d 130, *cert den* 421 US 1012 (1974); *State v. Smith,* 187 Kan 42, 353 P2d 510 (1960); *Lusby v. State,* 217 Md 191, 141 A2d 893 (1958); *State v. Beach,* 215 Neb 213, 337 NW2d 772 (1983); *Commonwealth v. Garland,* 475 Pa 389, 380 A2d 777 (1977).

Even assuming that admission of the evidence was error, defendant has shown no prejudice. At trial, he admitted that he had lied to Dixson. He admitted that he had lied to Fox. He also admitted that he had lied to his wife about his sexual misconduct with their daughter. More evidence that he had been untruthful was, therefore, merely cumulative. Any error in admitting the evidence was unlikely to have changed the result of the trial.[5] *See Johnson v. State,* 166 So 2d 798 (Fla App 1964). Therefore, it was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967); *State v. Van Hooser,* 266 Or 19, 25, 511 P2d 359 (1973).

The majority opinion finds fault with the prosecutor's closing argument. However, defendant did not object

---

results of the polygraph examination are not admissible in a court of law because there is no scientific basis that shows that a polygraph examination result is accurate. Polygraph test results are not reliable as evidence, and you are not to speculate as to whether or not there was a polygraph result in this case, or what that result was. You are only to consider the setting. You are not to speculate at all about whether or not there was a result to the test; or if there was a result what that result was.

"It is extremely important that you make that distinction because it is clear under Oregon law, and as far as I know every state in the Union, that polygraph examinations do not qualify as scientific evidence. They are not admissible anywhere, because it is not proven that they are reliable. Therefore, if a result is not reliable, it would be entirely inappropriate for you to speculate as to whether or not there even was a result, and if so, what that result is."

[5]Defendant's daughter, age fifteen at the time of trial, testified that defendant had engaged in sexual activity with her on numerous occasions, starting when she was in the fourth or fifth grade and was about eleven or twelve years of age. She testified about five specific instances of sexual intercourse and was cross-examined at length. In addition, the trial judge questioned her in the presence of the jury. The state's evidence showed that defendant admitted to police a series of sexual encounters with his daughter starting in 1980, when she was about age 11, and lasting about three and one-half years. At trial, he did not deny those encounters. He only denied *actual penetration* of the child or that he had improperly touched her *bare body.*

to that argument, and I would not predicate error on a ground not raised below. The majority opinion states that defendant could have been impeached without reference to the polygraph examination. While it is often the case that the state may make its point another way, that is also irrelevant. The question is not whether the state could have made its point another way, but whether admission of the evidence was error and, if error, whether it was prejudicial. In a different context, we recently stated:

> "[I]t is a perversion of an Oregon constitutional right to turn a shield (the right to keep the state from using illegally obtained evidence) into a sword (the right to take affirmative advantage of the unavailability of that evidence to work a fraud on the trier of fact). One of the functions of the exclusionary rule is to preserve the integrity of our judicial system by refusing admission to evidence that was obtained in violation of the document that created the judicial system — the constitution. But a court system that countenances perjury also loses its integrity — there can be no respect for law when a court is not even free to insist that witnesses appearing before it obey the oath they take to tell the truth. The proper balance of these twin challenges to the integrity of our judicial system is, we think, to permit a defendant to keep illegally obtained evidence from a jury unless he takes the stand — something he cannot be compelled to do — and, by his testimony, makes that evidence pertinent to determining whether he is telling the truth." *State v. Mills, supra,* 76 Or App at 310.

There is even less reason to permit defendant to work a fraud on the jury in this case where there is no claim that the disputed evidence was obtained by the police unlawfully and where there is no constitutional right affected by the admission of the evidence. I see no reason to put defendant's daughter through the ordeal of another trial. I would affirm his conviction.[6]

---

[6]Defendant's second assignment of error, that the trial court erred in denying his motion for a new trial, lacks merit. *See State v. Truxall,* 2 Or App 214, 217, 467 P2d 643 (1970).